LB4KHERH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MATTHEW HERLIHY, et al.,

4                Plaintiffs,

5            v.                              17 CV 3296 (PKC)

6   FYRE MEDIA, INC., et al.,

7                Defendants.

8   ------------------------------x
                                            New York, N.Y.
9                                           November 4, 2021
                                            11:43 a.m.
10
    Before:
11
                        HON. P. KEVIN CASTEL,
12
                                            District Judge
13
                            APPEARANCES
14
    GERAGOS & GERAGOS APC
15       Attorneys for Plaintiffs
    BY:  KAREN AGNIFILO
16       DANIEL ERIC LUST

17

18

19

20

21

22

23

24

25

LB4KHERH

1              (In open court)

2              THE DEPUTY CLERK:  For the plaintiff?

3              MS. AGNIFILO:  Good morning, your Honor.  My name is

4     Karen Friedman Agnifilo, and I am an attorney with Geragos &

5     Geragos.  I'm here joined by my colleague, Daniel Lust.

6              THE COURT:  Just tell me your last name again?

7              MS. AGNIFILO:  Agnifilo.

8              THE COURT:  Thank you, Ms. Agnifilo.

9              And good morning, Mr. Lust.

10             MR. LUST:  Good morning, your Honor.  Daniel Lust, on

11    behalf of Geragos & Geragos, for the plaintiffs.

12             THE COURT:  All right.

13             What is the electronic setup with regard to witnesses?

14    Can we do this so that we have one witness on the line at one

15    time, and then they log off, and the next person logs on?  Can

16    that be done?

17             MS. AGNIFILO:  Yes, your Honor, that's what we are

18    attempting to do, but, unfortunately, it keeps -- no matter

19    where the witness is located, whether it's in London or

20    Los Angeles, we're having a technological issue, and they keep

21    getting bumped off.

22             THE COURT:  Well, I guess this is what I'm saying:

23    Who is your first witness?

24             MS. AGNIFILO:  Ms. Ritu Jutla, who is on the screen

25    right now.

LB4KHERH

1            THE COURT:  All right.  That's wonderful.

2            So what I'm going to ask is that the other witnesses

3     disconnect, and you presumably can text them or otherwise

4     notify them when they should log on.

5            Would that be fine?

6            MS. AGNIFILO:  Yes, thank you.

7            THE COURT:  And then we will have just Ms. Jutla on

8     the screen, and that will be wonderful.

9            And you have hard copies of the exhibits for me?

10           MS. AGNIFILO:  Yes.

11           THE COURT:  That's wonderful.  That's terrific.

12           MR. LUST:  Your Honor, just the issue of the witnesses

13    logging off and not being on the same time is fine.  We have

14    Steven, from the Court's IT.  What's happening is the witnesses

15    are just unilaterally being bumped off.  So Ritu is not leaving

16    the system.  For whatever reason, it's knocking her off.  So I

17    just want to bring that to the Court's attention.

18           THE COURT:  Well, I understand.  Let's see how we go,

19    and if it happens with Ms. Jutla that this is, for some reason,

20    difficult to accomplish, we may ask Ms. Jutla to be patient and

21    take a different witness and then come back to her, and maybe

22    we'll have better luck in that regard.

23           All right?

24           MR. LUST:  Understood, your Honor.

25           THE COURT:  All right.

LB4KHERH

1          So you are familiar with my opinion and order of

2     December 1, 2020, on the default issue?

3          MS. AGNIFILO:  Yes, your Honor.

4          THE COURT:  All right.

5          So, you may call your first witness, Ms. Jutla.

6          MS. AGNIFILO:  May I ask the Court just for one point

7     of clarification prior to calling the witness?

8          THE COURT:  Yes.

9          MS. AGNIFILO:  We have divided the exhibits up by

10    witness, so each one has its own packet of documents.

11         THE COURT:  Right.

12         MS. AGNIFILO:  Just to keep this proceeding moving

13    quickly, I was wondering if your Honor would permit me to ask a

14    general question of the witnesses, because I got all these

15    documents from them, and then enter them all into evidence as

16    opposed to laying the foundation for each one?

17         THE COURT:  Well, that's fine.  That's fine, but I

18    will reserve decision on the admissibility.  You can offer

19    them, I'll take them, and I'll reserve on it until the end.

20         MS. AGNIFILO:  Thank you, your Honor.

21         And, your Honor, do you prefer that I sit or stand?

22         THE COURT:  Actually, it's a pandemic requirement that

23    you sit, so if you will, please.

24         MS. AGNIFILO:  Thank you.

25         I'm ready to proceed.

LB4KHERH

1        THE COURT:  All right.  You can call your first

2   witness.

3        MS. AGNIFILO:  Okay.  People call to the stand

4   Ms. Ritu Jutla.

5        THE COURT:  All right.

6        Ms. Jutla, good morning.  It may be afternoon or

7   evening where you are.  Where are you located?

8        THE WITNESS:  I'm located in London.  Good morning to

9   you.

10       THE COURT:  Good morning.

11       If you will please raise your right hand, I'm going to

12   administer an oath to you under penalties of perjury under the

13   laws of the United States of America.  Is that acceptable to

14   you?

15       THE WITNESS:  Yes.

16       THE COURT:  All right.

17   RITU JUTLA,

18       called as a witness by the Plaintiffs,

19       having been duly sworn, testified as follows:

20       THE COURT:  The Court reserves the right to require

21   you to execute a statement with regard to the transcript.

22       You may begin now, whoever is going to take the

23   witness.  Ms. Agnifilo.

24       MS. AGNIFILO:  Thank you, your Honor.

25

LB4KHERH                    Jutla - Direct

1   DIRECT EXAMINATION

2   BY MS. AGNIFILO:

3   Q.  Ms. Jutla, do you have any identification with you at this

4   time?

5   A.  I don't ON hand, no, but I can run and grab some.

6   Q.  Okay.  So after we're done, I'm going to ask you to grab

7   your identification just to show the Court, okay?

8   A.  Yes.

9   Q.  Tell me a little bit about yourself.  You live in London.

10          What do you do in London?

11  A.  So I work for Goldman Sachs in banking, and I've been

12  living in London for most of my life, but during the time

13  period that we are going to discuss, I was based in New York,

14  and I was working for JP Morgan Chase.

15  Q.  And was that in the period of time of 2016 to 2017?

16  A.  Yes, that's correct.

17  Q.  Did there come a time when you heard about something called

18  the Fyre Festival?

19  A.  Yes, yes.  So I heard about Fyre Festival, I think, a

20  couple of months leading up to the event, and it was something

21  that I think I first saw on a social media outlet, Instagram.

22  Q.  Tell me what you heard about it.

23  A.  So it was described and advertised as a luxury experience,

24  so it was --

25          THE COURT:  When was this?  When was this, ma'am?

1          THE WITNESS:  So this was in the few months before --

2     before the festival, so around January of that year.

3          THE COURT:  So this would have been January 2017?

4          THE WITNESS:  Yes, that's correct.

5          THE COURT:  Okay.

6          And where did you hear about the festival?

7          THE WITNESS:  So I first saw it on Instagram, so I saw

8     videos describing and demonstrating what the experience would

9     be, where the location would be, the fact that it would be a

10    luxury accommodation, that it would be a music festival, and

11    that it, frankly, was the first of its kind, and it was going

12    to be a luxury experience.

13         MS. AGNIFILO:  Thank you.

14    BY MS. AGNIFILO:

15    Q.  Did there come a time when you decided to purchase tickets

16    to this festival?

17    A.  Yes.  So I had a number of conversations with a number of

18    friends to decide if we would be attending, and there was

19    initially going to be a group of four of us, but it ended up

20    just being two of us that decided to book tickets to the event.

21    Q.  When was that, when did you decide to purchase tickets, if

22    you recall?

23    A.  I think it was -- I'm just checking my notes.  It was in

24    January.  So the 12th of January is when the tickets were

25    purchased.

LB4KHERH                    Jutla - Direct

1   Q.  What was it about the Fyre Festival and how it was

2   represented that made you decide that you wanted to go?

3   A.  So I think it was a combination of being on a luxury

4   island — it was described as being Pablo Escobar's island — and

5   that there were -- effectively no other events had ever taken

6   place there before.  It was also described as having luxury

7   accommodations.  There were several different options in terms

8   of the accommodation that was available.  And then also the

9   fact that it was generally a festival with a number of

10   experiences, lots of music, and a number of different people.

11          So, yeah, I think it was a number of different things,

12   and I think, overall, it was a fun holiday experience that we

13   were hoping for.

14   Q.  Were you aware that it was advertised as being on a private

15   island?

16   A.  Yes.

17   Q.  And was that fact important to you and material to you in

18   making a decision about whether or not you would attend?

19   A.  Absolutely.  Yes, I think that was one of the big decision

20   factors because it wasn't an island that we'd be able to visit

21   easily otherwise, but through the festival, it was an option to

22   be able to visit that island.

23   Q.  What about the fact that they were going to offer music at

24   this experience, was that a material fact in your decision to

25   purchase tickets?

1    A.  I think it was part of it.  I wouldn't say it was the most

2    material part of the decision.  It was just one component.  I

3    would say that the private island and the luxury accommodation

4    was probably more important than necessarily the music alone.

5    Q.  Were the luxury accommodations described to you about what

6    that would contain?

7            Because luxury can mean different things to different

8    people.  What was it described to you as?

9    A.  Yes.  So there were sketchings that were put on the

10   marketing information.  So they actually drew out what the

11   different levels of accommodation might be, and so it was, I

12   think, described as, you know, a -- definitely not a tent, it

13   was described as like a lodging, if you like, and there would

14   be bedding, et cetera, within the accommodation that we would

15   be staying in.

16   Q.  Did you expect that there would be electricity in your

17   accommodation?

18   A.  Yeah, I think we definitely expected that we'd be able to

19   charge our phones, at minimum, within --

20   Q.  Did you expect there to be other infrastructure, such as

21   toilets and showers and running water?

22   A.  Yeah, I believe that we expected running water, yes.

23   Q.  And was that important to you and material to you in making

24   a decision to purchase tickets to this festival?

25   A.  Yes, yeah.

LB4KHERH                         Jutla - Direct

1    Q.  I'm going to now direct your attention to closer in time to

2    the festival.

3            What was the date of the festival that you were

4    supposed to attend?

5    A.  Apologies, I should know this.  I'm just checking my notes.

6            I believe it was in -- it was April or May, so it was

7    in April.  So we were due to go on the first weekend, on

8    April 28th.

9    Q.  So tell us about the time leading up to the festival.

10   We'll get to how much money you spent specifically momentarily

11   when you purchased the tickets -- or unless you know, how much

12   did you spend when you bought the tickets on January 12th,

13   2017?

14   A.  So I purchased the tickets for two people, and it was

15   $3,879.45.

16   Q.  Who was the other person who you purchased the tickets for?

17   A.  For Zenovia Pittas.

18           THE COURT:  Can you spell that, please?

19           THE WITNESS:  Yeah.  It's Z-e-n-o-v-i-a is her first

20   name, and last name is P-i-t-t-a-s.

21           THE COURT:  Thank you.

22   BY MS. AGNIFILO:

23   Q.  So I'd like to now direct your attention to after

24   January 12, 2017.

25           Did there come a time when you spent more money on

LB4KHERH                      Jutla – Direct

1   this festival other than what you just said, the $3,879?

2   A.  Yes.  So we subsequently booked tickets from New York to

3   Miami, because I was based in New York and my friend, Zenovia,

4   had to book a ticket from London to New York because she was

5   based in London, and then we also booked hotels in Miami either

6   side of the festival so that we would spend a few days in Miami

7   first before flying to the festival, and then we would spend a

8   few days in Miami afterwards.  So there were additional

9   expenses that we incurred.

10          And then, also, we spent money updating and putting

11  money into a wristband.  So the way in which the festival

12  worked is they said it was a cashless system, there would be no

13  cash on the actual site, and that you would have to top up your

14  wristband, and whenever you wanted to buy something, you could

15  use the wristband to purchase items.  So we topped up $600 each

16  on our wristbands so that we had money available to spend when

17  we were there.

18  Q.  When --

19          THE COURT:  Well, let me ask you this:  You topped off

20  your wristband for $600, correct?

21          THE WITNESS:  Correct.

22          THE COURT:  And Ms. Pittas did the same thing?

23          THE WITNESS:  Correct.  We both subsequently,

24  separately, topped up our own wristbands.

25          THE COURT:  Okay.  I got it.

LB4KHERH                        Jutla - Direct

1          So you did yours for $600, but you purchased the

2    tickets for both of you; is that correct?

3          THE WITNESS:  That's correct.  I purchased the tickets

4    together, I purchased the flights together, and we purchased

5    the Miami accommodation together.  The only thing we did

6    separately was top up our own wristbands.

7          THE COURT:  All right.

8          Now, with regard to the tickets for the festival, were

9    you reimbursed by Ms. Pittas?

10         THE WITNESS:  Yes.

11         THE COURT:  Okay.  All right.

12         And how about as to the plane tickets, were you

13   reimbursed?

14         THE WITNESS:  Yes.

15         THE COURT:  Okay.

16         THE WITNESS:  Everything we split 50/50.

17         THE COURT:  How much were the plane tickets?

18         THE WITNESS:  So the plane tickets -- bear with me

19   just a second -- to Miami were a total -- so, sorry, each

20   $130.40 per return ticket to Miami.

21         THE COURT:  130.40 per person?

22         THE WITNESS:  Correct.

23         THE COURT:  Okay.

24         And that was from where to where, from New York to

25   Miami?

1          THE WITNESS:  Yes.  So that was from LaGuardia Airport

2     to Miami airport.

3          THE COURT:  That was a pretty good price you got.

4          THE WITNESS:  I know, right?  I guess because I'm an

5     American member.

6          THE COURT:  Did you purchase a return ticket as well?

7          THE WITNESS:  So that was the return ticket, so that

8     was from LaGuardia to Miami and Miami back, but then we

9     subsequently, given we had to ensure that in case we had to

10    leave much earlier than anticipated, we had to book additional

11    flights to get back to New York.

12         THE COURT:  Okay, that's fine.

13    BY MS. AGNIFILO:

14    Q.  Do you know the date that you purchased your tickets, the

15    plane tickets and the hotels?

16    A.  So the date we purchased the plane tickets says 14th of

17    January, so that was two days after we booked the festival

18    tickets.

19         And then the hotel was the 16th of January.

20         THE COURT:  How much was the hotel?

21         THE WITNESS:  So there were two segments to the hotel

22    stay.  The first segment was $373.94, and then the second

23    segment was $425.82.

24         THE COURT:  And that was for the two of you, correct?

25         THE WITNESS:  Correct, yes.

1              THE COURT:  All right.

2    BY MS. AGNIFILO:

3    Q.  Do you know the total amount, dollar amount, that you are

4    out as a result of the expenses that you just talked about?

5    A.  So it should be $3,267.40.

6              THE COURT:  And just so I understand, it sounds like

7    it's the case, but that would be, for example, one-half of the

8    festival tickets, one-half of the hotel, 100 percent of your

9    plane tickets, but only your plane tickets, and 100 percent of

10   your wristband, but only your wristband; is that correct?

11             THE WITNESS:  That's spot on, yes.

12             THE COURT:  Okay.  Thank you.

13   BY MS. AGNIFILO:

14   Q.  Ms. Jutla, tell us about what happened after -- well, when

15   did you top off your wristband?

16   A.  It was definitely closer to the time.  I believe it was in

17   April.

18   Q.  Ms. Jutla, we're having a hard time hearing you.

19   A.  Oh, sorry.  Can you hear me now?

20             THE COURT:  Yes.

21             THE WITNESS:  My apologies.  My hand was on the thing.

22             So I think it was topped up on -- I apologize, I don't

23   have the dates that we topped up.  I know there's a screenshot

24   of the confirmation.

25   Q.  Okay.  We'll talk about that in a moment when we go through

1    the --

2    A.   Right.

3    Q.   I'm going to now direct your attention to the actual

4    festival.

5             Did you make your way to go towards the festival?

6    A.   Yes.  So we made -- pardon?

7    Q.   When was that?

8    A.   We made our way to the festival, I believe, on April 28,

9    and so we were flying out the 28th, and we went to the

10   airport --

11            THE COURT:  We're having trouble hearing you,

12   Ms. Jutla.

13            THE WITNESS:  Sorry.  Can you hear me now?

14            THE COURT:  Yes, okay.

15            THE WITNESS:  Sorry.

16            Yes, so we went on the 28th, and we were allocated a

17   time slot for the flights that were arranged by the festival.

18   BY MS. AGNIFILO:

19   Q.   So you and Ms. Pittas got on a plane, and you went down to

20   Miami; is that correct?

21   A.   That's correct, yes.

22   Q.   And you were allocated a time to go on a charter flight, it

23   was supposed to be a private jet, to the island, correct?

24   A.   Correct.

25   Q.   And did you, in fact, get on a plane?

1  A.  Yes.  So we got on the plane, and we received our wristband

2  at the airport.

3  Q.  What was the plane like?  Was it a private jet like you had

4  been --

5  A.  It was -- no, it was not a private jet.  It was a charter

6  plane.

7  Q.  Was it luxury?

8  A.  No.  It was a standard charter economy plane.

9  Q.  And then what happened?  Where did the plane take you?

10  A.  So the plane took us into, I think, the island, where it

11  was not the island that was advertised, it was a different

12  island.

13         And I think the other point, probably just to

14  highlight, is that we received, whilst we were in the queue for

15  security, some information about the trip, about what we should

16  pack, and we also received information regarding how to tag our

17  baggage.  And so it said, "Please make sure that you get a

18  baggage tag that would indicate where your baggage would be,"

19  but, of course, that was far too late because we had already

20  checked in, so we were very concerned that we wouldn't have a

21  way to identify our baggage on arrival because the instructions

22  that were sent to us arrived after we checked in our baggage,

23  and nobody at check-in referred to any of those logistics.

24  Q.  So then what happened?

25  A.  So we landed on the island.  We were told not to worry

LB4KHERH                        Jutla - Direct

1   about our baggage, they put us on a small coach, a small van,

2   and then they said that the living accommodation was not yet

3   ready because there had been a storm overnight, and they drove

4   us to another location on the island.  And, effectively, they

5   had the prior flight that had arrived, they'd all been there

6   for, I think, a few hours, and they were just giving everybody

7   kind of food and alcohol and not really giving any information

8   as to when we would be able to go to the accommodation.

9   Q.  Was this Pablo Escobar's private island that you were on?

10  A.  No --

11  Q.  What was it?

12  A.  -- it was not.

13          It was the Island of Exuma, and I think there were,

14  you know, a number of other hotels and holiday resorts on that

15  island already, and it was not a private island.

16  Q.  So they took you to this location, gave you alcohol and

17  food, there were other people there.  What happened next?

18  A.  So we were left on the island the entire day, and then it

19  wasn't until the evening at that time that they started to

20  arrange coaches to take everybody back to where they would be

21  staying overnight, except --

22  Q.  We can't hear you.

23  A.  -- we were not -- we weren't given any kind of visibility

24  into where we were going, so we were queuing and waiting to get

25  on a coach to get to the area that we would be staying, and by

1    this time, it had gotten very dark at night.

2              And then when we arrived to where the accommodation

3    was, and we were told that they'd lost complete track of where

4    people were staying, and that we should just go and try and

5    find somewhere that there was an empty tent.  And, effectively,

6    there was a layout where there were just big white tents over a

7    construction site, what looked like a construction site, and we

8    had to just go and try and find one that was not already

9    inhabited.

10   Q.  Did the tents look anything like the drawing that you saw

11   or the rendering that you saw that caused you to purchase

12   tickets to this event?

13   A.  Absolutely not.  Nothing like what was advertised at all.

14   Q.  How was it different?

15   A.  They were effectively plastic, white cylindrical tents.

16   There were no new lodging accommodation, as was described in

17   the photographs, and then there was limited amenities inside.

18   So some of them had mattresses on the floor, and some of them

19   had towels, some of them had bedsheets, but some of them did

20   not.  So there was a lot of people running around between tents

21   trying to pull in mattresses so they had somewhere to sleep.

22             But, yeah, to answer your question, absolutely nowhere

23   near what was described in terms of the accommodation.

24   Q.  So did you find a tent?

25   A.  We eventually managed to find a tent.  We had to use -- I

1   had to use my eyeliner to write on the tent our names so that

2   there was no way it would get confused with anyone else's

3   because everyone was scrambling, and we -- yeah, and then we --

4   I mean, obviously, very frightened and concerned about what we

5   were doing there.  We ended up staying in that tent.

6   Q.  Why were you frightened?  What was frightening you?

7   A.  Well, firstly, at that point, we hadn't received our

8   luggage, so we didn't know if we would receive our luggage.  It

9   was clear that it was absolute chaos.  There was no control

10  over the event at all, and everything that we'd been promised

11  and what we expected that we'd paid for was not what was being

12  delivered, and we were concerned about how the rest of the few

13  days and how our time would be on the island because there was

14  nothing that we had access to.

15  Q.  Was there lighting?

16  A.  No, I don't think there was lighting.  I'm just trying to

17  recall.

18  Q.  Were there electrical outlets?

19  A.  No.

20  Q.  How about toilets?

21  A.  There were porta cabins located at different points and a

22  small number of showers.

23  Q.  What about bedding and blankets and that kind of stuff?

24  A.  So we were fortunate enough to be able to get mattresses,

25  and the locals that were working on the site also gave us,

1   generously, a number of towels and bedding.  So we did receive

2   all of those things, but it's probably not inconceivable that

3   some of the participants did not, because it was just so

4   haphazard.  There was no system around allocating any of those

5   items.

6   Q.  And did you go to sleep that night?

7   A.  No, I don't think we did really sleep that night.  We were

8   in an unsafe, unknown location, we were unable to, obviously,

9   lock the door of the plastic tent, so I think we were extremely

10  uncomfortable with where we were.

11  Q.  What happened the next morning?

12  A.  So the next morning -- I think we didn't have any network

13  on our phones either, so the next morning, we had, you know, a

14  number of the people that were there saying that the whole

15  thing had been canceled, and so I think we were just trying to

16  obtain information, and no information was really being shared

17  readily by the organizers.

18         So we went to the central place, which was effectively

19  what they called the blue house.  There was one house at the

20  end of all the tents, and we tried to get some information, and

21  they effectively were just running around, I would say, like

22  headless chickens trying to establish what to do.  And they

23  were running around with a clipboard, and people were

24  desperately trying to get their names on the list so they could

25  get on the first flight out of the island because it had been

confirmed that none of the acts were coming and that the whole

festival had been canceled.

Q.   Were you able to leave the island?

A.   So it wasn't until the evening that we left the island

because there was so much uncertainty around getting on a

flight back.  And we already, obviously, visited the airport on

the way in, it was very small, and so we didn't want to be

trapped at the airport without confirmation of a flight, and,

to be quite honest, there was so much disorganization about who

was being taken to airports and who was being allocated a

flight, so we waited, and then we kept going back to check in,

you know, every half an hour or hour to see if we were able to

get our names on the list to get on a flight.

     And then I think later that evening, probably, I

think, around maybe between 8:00 and 9:00 p.m., we were taken

to the airport, and then we had to queue to get on the plane,

but even the plane tickets were extremely disorganized.  You

had to write your own name on your boarding pass, and my

friend, Zenovia, wasn't allowed on the same flight I was

because they said her name wasn't on the list.  So there was a

lot of hysteria, people crying, people trapped at the airport.

They didn't know how they were going to get out of the island.

Q.   Did there come a time when you did get out of the island?

A.   Yes.  I managed to get on a flight.  I think I probably got

into Miami maybe at midnight that night, and then I had to wait

LB4KHERH                          Jutla - Direct

1    at the airport until my friend also got on a flight back.

2    Q.  Were you ever compensated for any of the money that you

3    spent on this festival?

4    A.  No.  So we received emails from the organizers apologizing

5    for basically the disaster that had occurred.  They said that

6    they would provide a refund, and they also said that Billy

7    McFarland said that he would provide an apology and ask people

8    to dial into a call and when he was personally going to

9    apologize, but we did not receive a refund, and I do not think

10   that call took place either.

11   Q.  You mentioned Billy McFarland.  Who is that?

12   A.  So we understand that Billy McFarland was one of the

13   organizers of the festival along with Ja Rule, and he was --

14   also, we saw him at the event when we were there within the

15   blue house, and so when I mentioned there were a number of

16   people pacing up and down, he was definitely one of the people

17   that we saw there, and I think, yeah, that our understanding

18   was he was one of the key organizers of the overall event.

19   Q.  Did you hear him speak at all, Mr. McFarland?

20   A.  We arrived after, I think, he spoke to other people, so,

21   personally, I did not hear him speak directly.  I only saw him

22   within the house from a distance.

23            MS. AGNIFILO:  Your Honor, at this time I'm going to

24   ask that the witness be permitted to take a look at Plaintiffs'

25   Exhibit C1 through 56 for identification.  Is that okay with

1   your Honor?

2          THE COURT:  Sure.

3   BY MS. AGNIFILO:

4   Q.  Ms. Jutla, I believe you have a stack of materials in front

5   of you that are marked as Exhibits C1 through C56; is that

6   correct?

7   A.  Yes, that's correct.

8   Q.  Could you please take a look at these items.

9   A.  Yes.

10  Q.  Have you seen these before?

11  A.  Yes.

12  Q.  What is this packet?  And where is it from?

13  A.  It's from all of the information that I have shared with

14  Geragos & Geragos.

15  Q.  So all of this information in this packet comes from you?

16  A.  Yes.

17  Q.  Could you please take us through item by item, and you can

18  just say, I'm looking now at Exhibit C1, this is what it is,

19  C2, this is what it is, and just sort of take us through, in

20  your own words, what these items are that you provided to us

21  and the Court today?

22  A.  Yes.  So Exhibit C1 and Exhibit C2 are confirmation of the

23  tickets for the festival.

24          Exhibit C3 is blank.

25          C4 are the flights to Miami that were booked from

1    LaGuardia Airport in New York, and the same with C5 and C6.

2              C7 through 8 is confirmation of the Miami hotels that

3    I booked, so the first leg and the second leg that I described.

4              I think the subsequent emails were emails that came

5    through.  So Exhibits C9, C10 were emails that came through

6    describing that there would be some kind of treasure hunt.

7    This came directly from the Fyre organizers.  So this was in

8    January after we booked our tickets.

9              And then C13 -- I'm checking -- it was information on

10   my traveler profile.  So it was confirmation that we needed to

11   confirm which flights we wanted to get on.  So that goes to

12   Exhibit C16.

13             Do you wanted me to pause?  I don't know if there's

14   any questions.

15   Q.  I will have a question about a particular exhibit, but

16   you're not there yet, so when you do get there, I'll ask you to

17   please pause.

18   A.  Sure.

19             So 17 is confirmation of the charter flights that we

20   were booked on for the Fyre Festival, so that's 17 and 18.

21             No. 19 is an email asking us to top up our wristbands.

22   Q.  So, really, this is the one I want to talk about.

23             So the email saying you want to top up your wristband,

24   that came, I see it says, April 24th, 2017, correct?

25   A.  Yes.  Yes, correct.

LB4KHERH                         Jutla - Direct

1   Q.   So that's four days before the festival began, correct?

2   A.   Correct, yes.

3   Q.   And is this the email that caused you to top up your

4   wristband in the amount of $600?

5   A.   So we received several emails that kept on asking us to top

6   up our wristband.  We received emails before and after we

7   topped up our wristbands.  I believe this was the one that

8   prompted us to top it up, but we also, I think on the day of

9   departure, continued to receive emails saying top up your

10  wristband.  So we felt as though they were trying to get as

11  much money out of us as possible by making us top up our

12  wristbands even more so, even once we topped them up.

13  Q.   But you believed this one from four days before is the one

14  that caused you to top it up?

15  A.   I believe so, but, as I said, apologies, there were a

16  number of emails that we received, yeah.

17  Q.   No worries.  Thank you for being so careful.

18           Please continue with Exhibit C22.

19  A.   Okay.  C22 were our flights -- oh, C22 were confirmation of

20  our flights, yeah, to the festival.  So these were the charter

21  flights that they booked for us.

22           C24 is another email about the wristbands.  Again, as

23  I mentioned, there were a few of those.

24           The same with -- C27 was more information about the

25  festival, the upcoming festival.

LB4KHERH                     Jutla - Direct

1          C30 was the email about what was happening on the

2     island, so there was more information about what to expect.

3          C32 was saying, again -- oh, sorry.  C32 was the

4     apology email saying --

5          THE COURT:  Wait.  C30 is an email that was sent to

6     you describing the accommodations on the island.  So I'm

7     interested in these communications you received in the lead-up

8     to your leaving from New York to head down to Florida.  And

9     these included which ones now, C23?

10          THE WITNESS:  One second.

11          So we left for Florida on the 26th of April.

12          THE COURT:  I see.

13          THE WITNESS:  So we were already in Miami, I think, at

14     that point.

15          THE COURT:  Okay.

16          THE WITNESS:  And then to answer your question,

17     No. 23 -- yes, then we started to receive updates about what to

18     expect when we got to the island, yeah, just whilst we were, I

19     think, either approaching Miami or in Miami.

20          THE COURT:  Right.  But if you knew that that was

21     false, you wouldn't have gotten on the charter flight, right?

22          THE WITNESS:  Absolutely.  Yeah, absolutely.

23          THE COURT:  All right.  Understood.

24          THE WITNESS:  Yeah, so there was no information prior

25     to getting on the charter flight that confirmed that this

1    festival wasn't going ahead.  I mean, I would lie to you if I

2    didn't say I was somewhat skeptical, but we paid for this, we

3    still believed that this was going to be a great experience.

4            So, yeah, there was nothing that indicated to us,

5    other than maybe just suspicion, that, you know, it wasn't

6    going to be or it was going to be canceled.

7            THE COURT:  Okay.

8    BY MS. AGNIFILO:

9    Q.  So I think we were on C30, correct?

10   A.  So, yes.  C30 was just another update on the event.  I

11   think by then, we were already on the island.

12   Q.  Yes, this is April 28th?

13   A.  Yes.  Yeah, we were already there.

14   Q.  The update is --

15   A.  Things aren't going well.

16   Q.  Correct.

17   A.  So -- and I think the reason for that email was for the

18   people that hadn't left.  Because we left on the 27th, it was

19   already too late for us.

20   Q.  C32, please?

21   A.  And C32?  Yeah, so C32 is confirmation that the whole thing

22   is canceled, even though I think we were already there.  And

23   this is where we got confirmation to say, you know, we should

24   wait for them to get us off the island as opposed to finding a

25   way to get off the island ourselves.

1    Q.  Please continue with C34.

2    A.  C34 was about our return flights, I believe.  Yeah, so this

3    was confirmation about how we were going to get off the island

4    and information about the flights.

5    Q.  And C36 and 37?

6    A.  So 36 and 37 was a last-minute accommodation that we had to

7    book when we landed.  So you will see that was at 20 to 1:00 in

8    the morning.  I had to randomly book a hotel for us to stay the

9    night because we only just landed into Miami, and, actually, I

10   was still waiting for my friend, Zenovia, to arrive, and so I

11   was stuck in the airport looking at hotels so we had somewhere

12   to sleep that night.

13   Q.  And 38 and 39 look like that's part of that as well?

14   A.  Yes, that's correct.

15   Q.  And C --

16   A.  And then 40, 41, 42, 43 were our flights -- additional

17   flights we had to book from LaGuardia at -- sorry, from Fort

18   Lauderdale back to New York.

19   Q.  And C44?

20   A.  And C44 was the apology email.  And this is the one I

21   mentioned about Billy McFarland where it says Billy McFarland

22   will reach out to each of you, and which he did not reach out

23   to us, and that's 44 and 45.

24   Q.  What's C46 and 47?

25   A.  So C46 was an example of the map that we were sent well in

1    advance about what the lodging and the floor -- you know, the

2    plan of the place would look like.

3              And then 47 was one of the adverts that was posted.

4              THE COURT:  Ms. Jutla, do you have records that would

5    reflect when you received the map and, for example, the

6    advertisement that is C47?  Is there a way to establish when

7    that was first made available to you?  Was that at or about the

8    time you purchased the tickets?

9              THE WITNESS:  I believe that the lodging in No. 46

10   might have been after we purchased the tickets, not before.

11   And I'd need to confirm on 47, but I can have a look through

12   because these were screenshots on my phone, so I think I would

13   need to find the screenshot and see when it was taken.

14             THE COURT:  Thank you.

15   BY MS. AGNIFILO:

16   Q.  C48, I see a date --

17   A.  C48?  Yeah, you're correct.  It says March 8th, I believe.

18             So that was one of the adverts, and as you can see, it

19   says home and yacht and tent packages available.  We'd already

20   purchased ours well in advance of that, in January.

21             And --

22   Q.  Go ahead, 49?

23   A.  49 is confirmation that we loaded our wristbands, $600

24   each.

25             50 was confirmation of the purchase of the general

1    tickets.

2            51 is a picture of the airport, the Exuma airport, the

3    outside.

4            And 52 was a photo of the flight from Exuma airport

5    back to Miami.  So that was that night flight to get us off the

6    island.

7            53 was a photo of the day when we were all waiting to

8    leave and everyone was hanging around, you know, not knowing

9    what was happening.

10            And 54 is an example of the tent, and as you can see,

11    it's like the mattress that I referred to and some initials

12    that are drawn on there.

13            55 was the stage, which was not complete, so it was an

14    abandoned stage that they tried to put up for the music.

15            And 56 was the first place that they put everyone on

16    when we arrived on the island when they took us on the coach.

17            THE COURT:  Let me ask you, Ms. Jutla, with regard to

18    C52, the airplane, how did the appearance of the plane that you

19    took from Miami to Exuma differ, if at all, from the appearance

20    of this plane?

21            THE WITNESS:  Yeah.  So the plane that we took from

22    Miami to Exuma did not say Fyre Festival on it.  I think it

23    said Swift Airlines.  There was no reference to the -- yeah.

24            THE COURT:  Thank you.

25            MS. AGNIFILO:  Your Honor, at this time, I would offer

1   Plaintiffs' Exhibits C1 through 56 into evidence.

2            THE COURT:  All right.  So noted, and the Court

3   reserves on them, but thank you.

4            MS. AGNIFILO:  One moment, your Honor?

5            THE COURT:  Yes.

6            (Pause)

7            MS. AGNIFILO:  Excuse me, your Honor.  I have one more

8   thing to show this witness, if possible.

9            THE COURT:  Sure.

10           (Pause)

11           THE WITNESS:  Should I take this opportunity to get my

12   ID?  It will take me 60 seconds.

13           MS. AGNIFILO:  That would be wonderful.

14           THE COURT:  Ma'am, I have a question for you.

15           Have you at any time put in any sort of a claim

16   against Fyre Media or Fyre Festival or the corporate entity

17   sponsoring the events?

18           THE WITNESS:  The only thing that I did was the --

19   raise the class action through another legal firm.

20           Do you mean through another mechanism?

21           THE COURT:  Well, for example, have you filed any

22   claim in any of the bankruptcy proceedings?

23           THE WITNESS:  No.  The only thing I did was through

24   the legal route, and then it came through to Geragos.

25           THE COURT:  Thank you.

1          MS. AGNIFILO:  Your Honor, may this witness go get her

2      identification?

3          THE COURT:  Yes.  Well, I haven't required this.  Is

4      there a reason why you're doing this?

5          MS. AGNIFILO:  I apologize, I thought that was a

6      requirement.  If it's not a requirement, that's not a problem.

7          THE COURT:  Well, if there is a requirement, I don't

8      know what it is.  The person has been administered an oath.  An

9      ID card is also dependent on the basic honesty of the person

10     because it doesn't really prove a whole lot to me sitting here.

11         MS. AGNIFILO:  Okay, your Honor.  That's fine.  We

12     wanted to be mindful of your Honor's requirement that we

13     protect against procedural safeguards for identifying

14     individuals, but --

15         THE COURT:  All right.  Well, then, why don't you do

16     that.  If you don't mind, just get your ID card.

17         THE WITNESS:  Sure.  I'll be one second.

18         THE COURT:  Thank you.

19         (Pause)

20         THE WITNESS:  Okay.  This is my driving license.

21         THE COURT:  I'm sorry, just hold that up again?

22         Thank you.

23         I'm looking at a driver's license issued in England

24     with the picture and name of the witness.

25         Thank you.

LB4KHERH

1          THE WITNESS:  You're welcome.

2          MS. AGNIFILO:  I have no further questions for this

3    witness, your Honor.

4          THE COURT:  All right.

5          Thank you, Ms. Jutla.  You are excused.

6          THE WITNESS:  Okay.  Thanks very much.  Goodbye.

7          (Witness excused)

8          THE COURT:  I just want to go over a few things.

9          As you know, in the case of Ja Rule, I've already

10   ruled that certain of the representations that he made were

11   plausibly alleged as fraudulent, and someone who acted upon

12   knowing of the representation and in reliance on the

13   representation would have a plausible claim for fraud.  That

14   was as to Ja Rule.  You know this, but I'll just say it for the

15   record:  A person who is promised, and in reliance on promises,

16   pays for a service that is not then delivered has a claim in

17   law.  It's known as breach of contract.  There is no claim for

18   breach of contract in this case.  This is a fraud case.

19          The question is:  Is there a plausible claim of fraud?

20   And as the Court indicated in its ruling on the default motion,

21   certain of the representations that were made — and they're

22   cited in my order — are, on their face, puffery:  "Fyre is an

23   experience and a festival, the cultural experience of the

24   decade, you'll find yourself among some of the most incredible

25   beaches and waters in the world"; or, not plausibly alleged to

LB4KHERH

1    be false, such as, "You can plan an excursion with a local dive

2    shop or plan a stopover to meet the pet sharks."

3              So you must allege, or show, that there is an

4    allegation, which, at the time it was made, was known to be

5    false.  What the evidence, even in this proceeding, shows is

6    inconsistent with fraud.  One does not build a performance

7    stage for a performance that they never have an intention to

8    conduct.

9              Sir, if you could just hold off before logging in,

10   please.  I'm talking to the lawyers right now.  Thank you.

11             That's inconsistent with it.

12             It's clear to me, based on having presided over this

13   case, that there was a fraud.  The question is:  When did it

14   become a fraud?  That's a question, and, certainly, statements

15   like a luxury experience, I think if you comb the case law,

16   you'll find the word "luxury" to be in the category of puffery

17   and not an actionable representation.  But then, again, when

18   somebody is telling you that this is going forward, and you are

19   loading money on a wristband in the belief that it's going

20   forward, at a point in time when a person knows it's not likely

21   to occur or can occur, that, to me, is fraud.  But I just want

22   to make sure that we stay focused on breach of contract, which

23   this is not about, and a tort claim against Mr. McFarland,

24   which requires scienter, et cetera, and the like.

25             Now, you don't have to prove it because he's

LB4KHERH

1    defaulted, but you have to plausibly allege it, and it has to

2    be plausible that the person who's seeking default relied on

3    statements that were false at the time they were made.

4           So this has always been, when viewed as a fraud case,

5    a bit more challenging than it would be if somebody was facing

6    a breach of contract case.  It would be very easy for a court

7    to say, my goodness, these people didn't get what they

8    contracted for, they're owed money.  But that's not what we

9    have here.

10          So I've said my peace, and you can call your next

11   witness.

12          MS. AGNIFILO:  Thank you, your Honor.  That was very

13   helpful.  I appreciate that.

14          THE COURT:  Okay, good.

15          MS. AGNIFILO:  The people call to the stand -- I'm

16   sorry, I keep saying people.  The plaintiff --

17          THE COURT:  I'm guessing you're a former prosecutor.

18          MS. AGNIFILO:  Thirty years at the Manhattan DA's

19   office.

20          THE COURT:  Okay, good.

21          MS. AGNIFILO:  So I apologize.

22          THE COURT:  No apology necessary.  It happens.

23          MS. AGNIFILO:  The plaintiff would like to call to the

24   stand Mr. Daniel Jung.

25          THE COURT:  Where is he located?

LB4KHERH

1          MR. LUST:  California, your Honor.

2          MS. AGNIFILO:  No, Jung?  He's in Amsterdam.

3          THE COURT:  Okay.  I recalled there was some

4     discussion of where he was at an earlier time.  Thank you.

5          The plaintiff calls Daniel Jung?

6          MS. AGNIFILO:  Yes, your Honor.

7          THE COURT:  Okay.

8          Where are you presently, Mr. Jung?

9          THE WITNESS:  I'm currently in Amsterdam.

10          THE COURT:  All right.

11          Are you a U.S. citizen?

12          THE WITNESS:  Yes, I am.

13          THE COURT:  All right.

14          I'm going to ask you to solemnly declare under penalty

15     of perjury that the statements you're making at this proceeding

16     are true and correct and under penalty of perjury under the

17     laws of the United States.

18          Is that agreeable to you?

19          THE WITNESS:  Yes, your Honor.

20          THE COURT:  And I may, at some point, require you to

21     follow up with a written statement as well.

22      DANIEL JUNG,

23          called as a witness by the Plaintiffs,

24          having been duly sworn, testified as follows:

25          THE COURT:  Thank you.  You can take your hand down.

LB4KHERH                          Jung - Direct

1              And you may proceed.

2              THE WITNESS:  A real quick note, sorry.  My Wi-Fi has

3    been really spotty tonight, so I do apologize.  If I do get cut

4    off, I'll try to join if that does happen.

5              THE COURT:  Thank you.

6    DIRECT EXAMINATION

7    BY MS. AGNIFILO:

8    Q.  Mr. Jung, you're living in Amsterdam; is that correct?

9    A.  Correct.

10   Q.  What do you do there?

11   A.  I work in finance at Uber.

12   Q.  How long have you lived in Amsterdam?

13   A.  A little under two years, or two years on the dot.

14   Q.  Where were you living in early 2017?

15   A.  I was living in Santa Monica.

16   Q.  California?

17   A.  Correct.

18   Q.  Did there come a time when you heard about the Fyre

19   Festival?

20   A.  Yes.

21   Q.  Can you tell us how you heard about it?  And what did you

22   hear?

23   A.  Yeah, of course.

24              So at this time, I guess, just to kind of set

25   everything together, I just graduated university.  So, again,

LB4KHERH                    Jung - Direct

1   I'd been away from my friends for four years studying out in

2   New York.  This was kind of the first time our friends could

3   all get together and go to this festival.  And so my friend

4   actually heard about it through a brand agency she worked at,

5   and so she obviously messaged myself and the rest of our group

6   and just gave us information about this once-in-a-lifetime

7   festival, you know, all these top performers playing, obviously

8   Pablo Escobar's island, all these headlines.  They sent that

9   over to us, and then they sent us over the website, the promo

10  video, and just kind of us got us all involved.

11          So that's kind of how we heard about it, through word

12  of mouth of my friend.

13  Q.  Did there come a time when you purchased tickets to this

14  festival?

15  A.  Yes.

16  Q.  Do you know when this was?

17  A.  Yes.

18  Q.  When was that?

19  A.  It was -- sorry, one second.

20  Q.  Are you looking at something to refresh your recollection?

21  A.  Yes, I am.

22  Q.  What are you looking at?

23  A.  My flight information.

24          It was confirmed on January 13th, 2017.

25  Q.  When was the -- what was the date of the festival that you

LB4KHERH                          Jung - Direct

1  were going to go to?

2  A.  May 5th to May 8th.  Or May 8th, yes, sorry.

3  Q.  Was that the second weekend of a two-weekend festival?

4  A.  Correct.

5  Q.  How much did you pay for the tickets that you purchased on

6  January 13th?

7  A.  For the tickets alone, just for the weekend two, was $500.

8  Q.  And you bought the tickets.

9         What about how it was advertised made you buy the

10 tickets?

11 A.  Yeah, so, again, it was one of those things where it was

12 advertised as this once-in-a-lifetime festival.  Even,

13 obviously, the tickets that we got for $500, we were told there

14 was a 24-hour sale, and it was going to increase by, again,

15 two X at least the next few weeks, and so we obviously just

16 pulled the money together very quickly, tried to get everything

17 together.

18         (Pause)

19         THE COURT:  Mr. Jung, if you don't mind, a little bit

20 more slowly, okay?

21         THE WITNESS:  Yes.

22         THE COURT:  We have a court reporter here who is

23 taking down your every word, so you have to speak a little bit

24 more slowly and more distinctly, if you don't mind, please.

25         THE WITNESS:  I apologize.  I'm new to all this.

1           THE COURT:  That's fine.

2           So go ahead.

3           THE WITNESS:  Sorry, where did I leave off?

4           THE COURT:  Well, you said that it would increase by

5   two X at least the next few weeks, and so we obviously just

6   pulled together the money very quickly, tried to get everything

7   together.  That's where you left off.

8           Is there a question pending?

9           MS. AGNIFILO:  No.

10          THE COURT:  Why don't you ask the next question,

11  please.

12  BY MS. AGNIFILO:

13  Q.  So that was in January of 2017, correct?

14  A.  Correct.

15  Q.  And between January of 2017 and May, early May -- or I

16  should say, actually, end of April, early May of 2017, did you

17  continue to get communications from Fyre Media, Fyre Festival,

18  or anybody regarding your upcoming trip?

19  A.  Yes, I did.

20  Q.  And can you characterize those communications and

21  approximately how many there were?

22  A.  Yes.  There were a little over 15 emails and more,

23  including after weekend one, I had emailed multiple times

24  regarding the status of weekend two.  I had also emailed prior

25  to weekend one asking about a charter flight and got no

LB4KHERH                    Jung - Direct

1   response.

2          On top of those, there were also emails from Fyre

3   Festival regarding flight assignments, as well as some

4   headliners that were performing, such as Blink 182, Amigos,

5   Lil Yachty, and, also, on top of that, of course, there was the

6   email regarding the Fyre bands.

7   Q.  Tell us about the email regarding the Fyre bands.

8   A.  Yeah, so the Fyre bands, the email that we had gotten

9   stated that we could not enter without these Fyre bands, and

10  that on these Fyre bands, they recommended to put money into

11  them because the cash registers or the ATM machines or the card

12  readers were not guaranteed, basically.  And so we were advised

13  to put money into these bands.

14  Q.  So I'm going to ask you to take a look at -- hopefully, you

15  have printed in front of you a few documents that are stamped

16  Exhibits G1, G2, and G3.

17         Could you take a look at those.

18  A.  Yes, I have them right here.

19  Q.  Are these documents that you gave to me regarding your

20  experience at the Fyre Festival?

21  A.  Yes.

22  Q.  Can you describe for us what these are?  What is G1?

23  A.  G1 pertains to the -- oh, sorry.  G1 pertains to the Fyre

24  band.  As it mentions, that the Fyre Festival was a hundred

25  percent cashless, and it gave you a QR code to enter the Fyre

1  Festival.

2  Q.  This is 17 days away from -- it says on there 17 days away,

3  correct?

4  A.  Correct.

5  Q.  From when you were supposed to arrive, correct?

6  A.  Correct.

7  Q.  So that's the second weekend.

8            So, as a result of this communication, was it your

9  understanding that the Fyre Festival was still going to go on

10 as planned?

11 A.  Yes, hundred percent.

12 Q.  Did you rely on this email and spend any of your money?

13 A.  Yes.

14 Q.  How much?

15 A.  If you can see -- sorry, yes.  If you can see on the bottom

16 of Exhibit G1, they recommended at least 300 to 500 dollars a

17 day.

18 Q.  Okay.

19 A.  And so with that, I believe I put in around 500, 600

20 dollars into this band.

21           THE COURT:  Do you have a record which would indicate

22 whether it was 500 or 600?

23           THE WITNESS:  I would have to check, but my credit

24 card only allows me to go back two years, and this happened

25 four, five years ago.

1              THE COURT:  All right.

2              Do you know when you put the money on the band?

3              THE WITNESS:  Yes.  It should have been around April.

4              THE COURT:  Would there be an email confirmation of

5    some sort that indicated that you had put money on the band?

6              THE WITNESS:  I could take another look.  I couldn't

7    find anything, but I do remember the conversation between our

8    friends going around that we had to put money into this band.

9              THE COURT:  All right.

10   BY MS. AGNIFILO:

11   Q.  Was it as a result of this communication of G1 that you

12   then put money on the band?

13   A.  Correct.

14   Q.  And that was sent, it says, 17 days away from when you are

15   going on your trip, correct?

16   A.  Correct.

17   Q.  So that would make this approximately April 18th, 2017,

18   correct?

19   A.  Correct.

20   Q.  Approximately?

21   A.  Approximately.

22             THE COURT:  So it was sometime between the receipt of

23   this email and before the first weekend; is that right?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  It was before the first weekend -- I know

1  you weren't going the first weekend, but it was in that window

2  of time, correct?

3           THE WITNESS:  Correct.

4           THE COURT:  Okay.  Thank you.

5  BY MS. AGNIFILO:

6  Q.  Tell us what G2 is, please.

7  A.  G2 is a list of all of eight of our friends.  Again, this

8  was post university, where we had all spent the last four years

9  not in the same country or not in the same state, and so it was

10 a time for us eight to get together and go to the festival.

11 Q.  What are the numbers that are reflected on G2?

12 A.  The numbers are the costs of the discounted tickets.

13 Q.  And then please tell us what G3 is.

14 A.  Yes.  G3 -- so, obviously, what the initial ticket

15 included, based off the emails, were a roundtrip flight and

16 boat between Miami and Fyre Cay, eight tickets to the festival,

17 14 beds, meals included, but the reason I'm calling that out is

18 it only took you from Miami, so we had to buy separate tickets

19 from San Francisco or L.A. to Miami.

20 Q.  So do you know the total dollar amount that you are out as

21 a result of this festival?

22 A.  Yes.  Around $1,400.

23 Q.  That's an estimate that you're saying, you're not sure

24 exactly the amount, but that's about how much you are

25 estimating you're out, correct?

LB4KHERH                    Jung - Direct

1    A.  Correct.

2              There were also costs associated pertaining to the

3    cancellation of the event.  For example, my flight to D.C. to

4    go -- I had just joined a new job, and I had initially had to

5    cancel a flight, so I wasn't able to book a flight because of

6    weekend two, and the team meeting was during weekend two, and

7    so because weekend two ended up being canceled, I had to buy a

8    last-minute flight to Washington, D.C. --

9    Q.  And is that --

10   A.  -- to make the team --

11   Q.  Was that flight to Washington reflected in this $1,400?

12   A.  Yes.

13   Q.  Now, did you ever go to the Fyre Festival?

14   A.  No, I did not.

15   Q.  Why is that?

16   A.  Because weekend one went into flames, and they sent an

17   email for weekend two saying it was canceled.  In between

18   weekend one and weekend two, I emailed the organization asking

19   if there was any update on weekend two.  I have a couple of

20   emails on that, but no responses.  And so, ultimately, they

21   ended up sending a mass email that weekend two was no longer

22   happening.

23   Q.  Just going back to when you put money on the Fyre band,

24   sometime on or about or after April 18th, 2017, were there any

25   statements that were made that you were relying on that caused

1  you to put money on that band?

2  A.  Yes.  The recommendation of 300 to 500 dollars that they

3  had sent in the email, as well as -- yeah, just mentioning how

4  you needed money on there to buy food, get drinks, merchandise.

5  Q.  So it was represented to you, on or about April 18th or

6  after, that the festival would occur, correct?

7  A.  Correct.

8  Q.  That there would be musicians, correct?

9  A.  Correct.

10  Q.  And lodging, correct?

11  A.  Correct.

12  Q.  Food and all of that?

13       And you relied on that when you -- those statements,

14  that you put money on that band.

15       And those statements, were they made to you how?

16  Email, social media?  Could you describe how they were made and

17  by whom?

18  A.  Yeah.  So they were made primarily by email is how I got

19  the personal notifications --

20  Q.  Email from --

21  A.  -- from the Fyre Festival.

22       And then besides that, there was also social media.

23  They were continuing to promote it.

24  Q.  When you say "they," do you mean Fyre Media was continuing

25  to promote it?

LB4KHERH                    Jung - Direct

1   A.  Yes.  Yes, Fyre Media.

2   Q.  And that was in from April 18th moving forward, they were

3   continuing to promote it, correct?

4   A.  Correct.

5   Q.  Had you ever heard of Billy McFarland prior to the festival

6   ending or not happening?

7   A.  No, I had not.

8        MS. AGNIFILO:  Your Honor, at this time, I would ask

9   that Plaintiffs' Exhibits G1 through 3 be admitted into

10  evidence.

11       And I have no further questions for Mr. Jung.

12       THE COURT:  All right.

13       I will take them subject to reservation on the

14  admissibility.

15       (Plaintiffs' Exhibits G1 through 3 received in

16  evidence)

17       Mr. Jung, thank you very much for participating in

18  today's hearing.  You are excused.

19       Thank you.

20       THE WITNESS:  Thanks for your time.

21       THE COURT:  Thank you.

22       Let's take a break.  We'll pick up in ten minutes.

23  Thank you.

24       (Recess)

25       THE COURT:  You may call your next witness.

LB4KHERH                        Jung - Direct

1          MS. AGNIFILO:  Plaintiff calls to the stand

2     Ms. Zenovia Pittas.

3          THE COURT:  All right.

4          Could you please spell your first name?

5          THE WITNESS:  Yes.  My full name is Z-e-n-o-v-i-a.

6          THE COURT:  All right.

7          And the last name?

8          THE WITNESS:  P-i-t-t-a-s.

9          THE COURT:  And where are you presently now?

10          THE WITNESS:  I am in London, United Kingdom.

11          THE COURT:  All right.

12          I'm going to, in a moment, ask you to raise your right

13     hand and swear, affirm, and declare that you will be telling

14     the truth, the whole truth, and nothing but the truth, and that

15     your statements will be true and correct, all under penalty of

16     perjury under the laws of the United States of America.

17          Is that acceptable to you?

18          THE WITNESS:  Yes, yes, it is.

19          THE COURT:  I may also ask you, at some point, to

20     supply a written declaration as to your testimony.  Do you

21     understand that?

22          THE WITNESS:  Yes, I do.

23          THE COURT:  All right.

24          (Continued on next page)

25

1    ZENOVIA PITTAS,

2          called as a witness by the Plaintiffs,

3          having been duly sworn, testified as follows:

4                THE COURT:  Thank you very much.

5                You may inquire.

6                THE WITNESS:  No problem.

7    DIRECT EXAMINATION

8    BY MS. AGNIFILO:

9    Q.  Ms. Pittas, good afternoon.

10               Where do you live?

11   A.  Good afternoon.

12               I live in London.

13   Q.  What do you do in London?

14   A.  I work at Goldman Sachs.

15   Q.  Are you friends with somebody named Ritu Jutla?

16   A.  I am, yes.

17   Q.  How do you know her?

18   A.  We've been friends since childhood, best friends.

19   Q.  I'd like to direct your attention to a time frame of early

20   2017, so January or so of 2017.

21   A.  Yes.

22   Q.  Where were you living at that time?

23   A.  In London.  I've always been in London.

24   Q.  Did there come a time around that time that you heard about

25   something called the Fyre Festival?

LB4KHERH                    Pittas - Direct

1    A.  Indeed, yes.

2    Q.  And can you tell us about that?

3    A.  Yes.  Ritu, we speak every day once --

4             THE COURT:  You have to slow down and speak

5    distinctly.  We have a wonderful person here, a gentleman, who

6    is taking down this proceeding word for word, a court

7    stenographer, so please --

8             THE WITNESS:  Okay.  Apologies.

9             Ritu contacted me and said she had heard of a festival

10   called Fyre Festival that looked very luxurious, would I go

11   with her.  We asked some other friends.  In the end, they

12   weren't available.  And we decided to -- I Googled it quite

13   quickly after she asked me about it, saw what the event was,

14   and swiftly decided to book.

15   BY MS. AGNIFILO:

16   Q.  Do you know when that was, roughly?

17   A.  That was in January, I believe, mid, actually the 12th or

18   so of January.

19   Q.  What was it about the festival, the way it was being

20   advertised, that caused you to want to purchase tickets?

21   A.  Multiple factors.  It was marketed as a very luxurious

22   gussy event.  It was sold as be part of something.  You know,

23   the new best music event to come out, it was a private island,

24   it was luxury from beginning to end.  The musical acts that

25   were involved, I believed to be quite, you know, very

1    well-known.  I thought if they had that backing, that it would

2    potentially be a wonderful event, and it was just sold as a

3    very gussy package, very desirable.

4    Q.  I'm going to fast forward to the amount of money that you

5    spent to make this festival happen.

6           Can you take us through the various purchases and

7    amounts of money you spent on this festival?

8    A.  Yes.  Initially, Ritu purchased a package for two for

9    around 3,900 and something dollars for the two of us.  That was

10   for -- marketed to get yourself to Miami, and from Miami, we

11   will take you by private jet, white glove service, to a luxury

12   island with luxury-built accommodations with beds and lighting,

13   electricity, water, everything.  So we booked that package.

14          I then booked flights from London to New York, return

15   flights.  We also then booked flights from New York to Miami.

16   We booked hotels in Miami.  We then subsequently did a lot of

17   shopping for festival-appropriate attire and the planning in

18   between.  So there were multiple expenses that came up from the

19   January until the festival.

20   Q.  Between January and the festival, did you receive

21   communications from the Fyre Festival media teams?

22   A.  We received a -- it was marketed as being Pablo Escobar's

23   island.  There was going to be a treasure hunt on the island.

24   I think somebody threw around a million-dollar treasure hunt.

25   There was a marketing tool on Instagram to advertise an orange

box which you put in your Instagram page, and people were

following this supposed orange box, which we did.  Obviously,

the marketing online by multiple celebrities.  It was going

round.

          We booked when we booked because we were told there

are only very few tickets left for a 24-hour period, so book as

soon as possible.

          So we did.  We felt pressured into making a decision

quite quickly.

          And, yeah, it kind of spiraled from there, really.

There was a lot of marketing.  We actually did, talking about

marketing, try to contact people in the interim from booking to

the event to get clarity on what we needed to travel, what we

needed to bring, facilities, and as it transpired, the closer

it got to the event, the communication dwindled.

Q.  What about the Fyre band?

A.  Yes, we were told quite close to the event — I believe, if

memory serves, that I was already in New York at that point

preparing to go to Miami — that we were told that it would be a

cashless island, and we were strongly advised to put as much

cash as possible onto these wristbands, because that would be

all we could spend, so it would be easier to do it before we

got to the island.

          We were concerned about internet connections and money

in general there, so we were quite tempted and put $600 each

1   onto these virtual wristbands.

2   Q.  Is that how much you put on?

3   A.  Yes.

4   Q.  You said it was when you were already in New York, so

5   approximately --

6   A.  I believe it was quite close to the event because we were a

7   little bit concerned about the fact that we hadn't received a

8   lot of information prior to that because Ritu and I were both

9   trying to contact anyone at Fyre Festival to say, you know,

10  will there be towels, will there be -- what facilities will

11  there be that we can use, and the information -- like I said,

12  the closer we got to the event, the information got less and

13  less.

14  Q.  Approximately what date was it that you received this

15  communication when you were in New York to put money on your

16  Fyre band?  Approximately when was that when you were in

17  New York?

18  A.  I was in New York, I believe, a week prior to the festival,

19  so it would have been in that time frame.  I'm sorry, I can't

20  remember specifically when we got that.

21  Q.  Approximately April 21st; is that correct?

22  A.  Potentially, yeah.

23  Q.  At that time, when you put $600 on your Fyre band, did you

24  believe that there was a festival that was still happening?

25  A.  Yes, I did.  Even though the rest of the information was

1    very sparse, the fact that they had said put money on a

2    wristband, and they had potentially the capacity to run a

3    cashless island, we thought was quite promising moving forward.

4    Q.  So they represented to you that there was going to be a

5    festival within --

6    A.  Yes.

7    Q.  -- a week prior to the festival; is that correct?

8    A.  Yes, absolutely.

9    Q.  And had you known that there was not going to be a

10   festival, would you have put $600 on that Fyre band?

11   A.  No, definitely not.

12   Q.  I'm going to -- hopefully, you have a packet in front of

13   you --

14   A.  Yes.

15   Q.  -- of documents that --

16   A.  I do.

17   Q.  -- if you look at the bottom right, they're marked

18   Exhibits E1 through E30, I believe.

19   A.  Yes, I do.  I have them.

20   Q.  Is this a packet that you provided to me?

21   A.  Yes, I believe I sent it to Dan.

22   Q.  Yes, to Dan from Geragos & Geragos; is that correct?

23   A.  Yes.

24   Q.  And this packet represents your evidence that you have that

25   you would like to present regarding your experience with the

1    Fyre Festival; is that correct?

2    A.  Yes.

3    Q.  I'd ask that you please take us through this packet, and,

4    as you're talking about each document, you could identify it

5    for us with the exhibit number at the bottom, if you wouldn't

6    mind, and just tell us, in your own words, what each of these

7    things represent.

8    A.  Okay.  E1 is an exhibit of our boarding passes from Miami

9    to Great Exuma, and this, to me, represents the beginning of

10   the end because it wasn't a private jet, as we were promised,

11   it was a very extremely budget airplane, which had -- if I had

12   known what I was getting into, I wouldn't have got onto it

13   because I didn't think it was even safe.

14          And, also, it was misleading because it was meant to

15   be on a private island, and it transpired that they flew us to,

16   you know, a larger island, and it wasn't what we were promised.

17          Exhibit E2 is my booking confirmation from British

18   Airways for my flight from London to New York in anticipation

19   of the festival and what I spent on that.

20          Exhibit E3 is the marketing material called the duo

21   with the image of what we were sold and told to -- the day Ritu

22   asked me about going to the festival in January, this was what

23   we saw, and it said, "Book now.  Limited availability for the

24   next 24 hours.  Book now to secure this accommodation."  As you

25   can see, it's VIP boutique housing.  It's much more than what

1   was provided.

2   Q.  So just sticking with this, when you purchased your tickets

3   on January 12th, 2017 --

4   A.  Yes.

5   Q.  -- you purchased this particular room, which was one --

6   A.  Yes.

7   Q.  -- of several offerings; is that correct?

8   A.  It was.  This was, if memory serves, the best of the bunch

9   that was available on the website for us to get.  Ritu and I

10  wanted to enjoy our experience to the fullest, so we went for

11  what was available, and, obviously, as you can see, it's a lot

12  more than what happened.

13  Q.  When you purchased your tickets, you thought you were

14  purchasing, I see, two twin beds or two beds; is that correct?

15  A.  Yes, two beds.  Obviously, it looks like an actual built

16  accommodation rather than a tent.  You know, you can see sofas,

17  coffee tables, lighting, windows.  So, yes, that enticed me

18  because I thought I was getting myself into a safe

19  accommodation.  It was luxurious site.

20  Q.  Was that a material part of your decision-making when you

21  purchased the tickets, that you would get housing that looked

22  something like this, not --

23  A.  Absolutely.

24  Q.  -- identical amenities like this?  Was that important to

25  you?

LB4KHERH                    Pittas - Direct

1   A.  Oh, yes, yes.  I would never have agreed to go had I known

2   it would be anything less than this.

3   Q.  Can you please continue with E4?

4   A.  Yes.

5        E4 is one of the Instagram posts that promoted the

6   music.  Obviously it says the GOOD Music family, which I

7   believe was tied to Kanye West at the time, Major Lazer,

8   Disclosure, who I was very tempted to see because I enjoy the

9   music, and obviously being very well-known music acts, I

10  thought if they've secured them, we must be on to something

11  good.

12       THE COURT:  Ms. Pittas, it's going to be sufficient if

13  you describe what the document is, and I'll be reading the

14  documents.

15       THE WITNESS:  Okay.

16       THE COURT:  All right?

17       And if counsel wants to ask you follow-up questions,

18  she will.  Okay?

19       THE WITNESS:  Okay.

20       THE COURT:  All right.  Go ahead.

21       THE WITNESS:  So E5 is another promotional item with a

22  website High Society promoting the festival and talking about,

23  obviously, celebrities like Kendall Jenner, social media, GOOD

24  Music headlining the festival, again, all positive promotions.

25       Exhibit E6 is the VIP retreat that we looked at that

LB4KHERH                          Pittas - Direct

1    was what was sold to us and limited availability, prices will

2    be increasing soon.  That was very enticing to us.  You know,

3    it said meals included, everything would be available.  So that

4    was a huge factor in our decision-making.

5              E7, again, goes in to describe the package, again, the

6    push for limited availability, flights included, and basically

7    promoting the event.

8              E8 demonstrates the contact we were using, the

9    concierge@fyreact.com to try and get more information regarding

10   the facilities.

11             E9 is -- were probably the concierge team regarding

12   the flights that were apparently happening, the complimentary

13   charter flight.  I believe when we received this, we did think

14   it wasn't a charter flight, but we were trying to be positive

15   about the situation.

16             E10, again, is just a screenshot related to the event

17   and then asking for more information to confirm the flight.

18             THE COURT:  Now, take a look at E9.  Do you know when,

19   approximately, you received this?  It says today at 11:18 p.m.

20   Do you know approximately when it was you received this?

21             THE WITNESS:  I, unfortunately, don't because it was

22   on an older telephone of mine, and I couldn't find the

23   emails --

24             THE COURT:  Thank you.

25             THE WITNESS:  -- that relate to that.

1          THE COURT:  Thank you.

2          THE WITNESS:  Moving on to E11, I believe this was

3     post the festival.  This was, I think, come the day of the day

4     after, basically when we initially realized that things had

5     gone wrong, and we managed to get ourselves back to Miami and

6     New York, they started sending a lot of items saying we promise

7     to make it up to everybody, and it wasn't what we intended.

8     Obviously, doing some damage control.

9          Again, E12 signifies that same sentiment.

10         And E13, I believe, is a continuation of E12.

11         Again, E14 is around the same thing.  It was post the

12    event.  That's on the 28th of the 4th, 2017, basically,

13    explaining what had gone wrong and asking us for understanding.

14         E15 is the continuation of that first message.

15         E16, I believe -- I can't really make out myself what

16    that picture is, but it was something relating to the

17    promotional, please stand by for the festival.

18         E17 is, again, the promotion -- the Duo.  That's the

19    accommodation again.

20         E18 is the bar that they -- basically when we flew

21    from Miami to Great Exuma, and it was clear that it was an

22    absolute disaster, they put us on old yellow school buses with

23    no luggage, no communication, and dropped us all at a bar on a

24    beachside and said we can't take you to the actual festival

25    site because it's not ready, hang tight here at the bar, we

LB4KHERH                        Pittas - Direct

1    will try and do what we can.

2                THE COURT:  It's a fair and accurate depiction of the

3    bar; is that correct?

4                THE WITNESS:  Yes.

5                THE COURT:  Okay.

6                THE WITNESS:  Uh-huh.

7                THE COURT:  Please proceed.

8                THE WITNESS:  E19 is one of -- well, is a stage that

9    was at the actual festival site once we made it there.  It was

10   clear at that point that it wasn't going to be anything.

11               E20 is a picture of the supposed safe lockers for your

12   personal belongings.  The selling point prior to us going to

13   the island was that they were very aware that we all have, you

14   know, jobs and obligations, that we may have laptops and

15   valuable personal items, so they said there will be facilities

16   for you to store your valuables when we got there.  It seemed

17   it was this unfortunate-looking bunch of lockers with no actual

18   locks on them, and, quite honestly, they were, I believe,

19   kicked over by the end of the day anyway.

20               E21 is a picture of an accommodation and the mess in

21   front of it.

22               E22 was a picture -- is a picture of, if memory

23   serves, the general store that was actually -- as it is in the

24   picture, nothing was set up because nothing actually

25   transpired.  That's that one.

1          E23, again, is just a picture of the actual setup.

2          E24 is the bar again.

3          E25 is the stage photo again.

4          E26 is the locker photo again.

5          E27 is Ritu and I trying to find our tent because

6    there was no way of identifying whose was whose, and there are

7    items being moved around all over the place.

8          Again, with E28, that was us trying to obtain any sort

9    of facilities there.

10         And, again, with the E29 and 30, that's just our -- we

11   managed to grab some -- sadly, dragged -- we had to drag some

12   mattresses across the sand ourselves, and that was the outcome.

13   BY MS. AGNIFILO:

14   Q.  Thank you so much, Ms. Pittas.

15         Do you know the total calculation of the amount of

16   money that you are out as a result of the Fyre Festival?

17   A.  I mean, on paper -- I've got it on my phone.  Excuse me one

18   second.

19         I believe it to be -- actual calculable costs to be

20   around, I would say, $3,000 -- sorry, 4-1/2 thousand dollars

21   because I've got additional costs because of my flights to and

22   from London, and, in reality, we actually spent a lot more on

23   incidentals that we can't really find evidence of now because,

24   you know, it was a while ago, and we spent on, as we said,

25   different clothing and other things for the festival.

LB4KHERH                         Pittas - Direct

1          THE COURT:  Let's try it this way:  How much did you

2     pay for your tickets for the festival?  That was approximately

3     how much?  One-half of 3900?

4          THE WITNESS:  Yes.  So I believe it was $1,939 each

5     person.

6          THE COURT:  Okay.  And you put --

7          THE WITNESS:  Six hundred --

8          THE COURT:  -- 600 on the wristband?

9          THE WITNESS:  On the band, yes.  Then we had one plane

10    ticket that was $130.40.

11         THE COURT:  Right.

12         THE WITNESS:  Hotels totaling $484.07.

13         THE COURT:  Is that your portion, one-half of that?

14         THE WITNESS:  No, I believe that's individual.

15         THE COURT:  Okay.  That's fine.

16         Go ahead.

17         THE WITNESS:  And then I have my flight, which, if I'm

18    correct, was -- sorry, bear with me.  I did have it in front of

19    me.  My flight in pounds was 1,056 pounds .37.

20         THE COURT:  Okay.  That's in pounds.  That's fine.

21         THE WITNESS:  That's in pounds.

22         THE COURT:  All right.

23         And that's the roundtrip to London?

24         THE WITNESS:  Yes.

25         THE COURT:  And anything else?

LB4KHERH                        Pittas - Direct

1              THE WITNESS:  Not that I can find evidence of at the
2      moment.
3              THE COURT:  All right.  Thank you very, very much.
4              Anything further from Ms. Pittas?
5      BY MS. AGNIFILO:
6      Q.  Do you happen to have identification with you?
7      A.  Yes, I do.
8      Q.  Would you mind just showing that to the Court?
9              THE COURT:  Ms. Pittas is holding up a United Kingdom
10     driver's license with her name and photograph on it, and I
11     thank her very much.
12             THE WITNESS:  No problem.  Thank you.
13             THE COURT:  All right.
14             You may disconnect.  Thank you.
15             MS. AGNIFILO:  Thank you, Ms. Pittas.
16             THE WITNESS:  Thank you very much.  Thank you.
17             (Witness excused)
18             THE COURT:  All right.
19             One moment off the record.
20             (Discussion off the record)
21             THE COURT:  Call your next witness, if you would,
22     please.
23             MS. AGNIFILO:  Plaintiff calls Daniel Sepulveda.
24             THE COURT:  All right.
25             THE DEPUTY CLERK:  What exhibits were the last ones?

LB4KHERH                    Pittas - Direct

1          MS. AGNIFILO:  E1 through E30.

2          And this will be D.  This next one will be D.

3          THE COURT:  D for David?

4          MS. AGNIFILO:  D for David.

5          THE COURT:  While Mr. Lust is getting in touch with

6    the witness and we're waiting for the witness to log on, what

7    I'm going to ask you to do when this is all finished — and

8    we'll talk about the timing on this, I'm thinking a week; if

9    you need two weeks I could be open to that — I'm going to have

10   you put in a, if you will, supplemental letter brief in support

11   of your application.  You can make your best arguments, your

12   best case, and you can present alternate theories if you want.

13   If you want to say, in our view, this is what was proven and

14   this is what should be awarded, if the Court is of a different

15   view, then, at a minimum, this should be awarded — that's free

16   for you to do.

17          The other thing I'd like you to do is submit a

18   proposed default judgment, and I'm going to have you submit

19   that not only in hard copy, filed on ECF, but you're going to

20   email to the chambers' email address a Word version of that

21   document so we have it.  All right?

22          MS. AGNIFILO:  Thank you.

23          And, your Honor, will you let me know if, as part of

24   this submission, you would like affirmations from the

25   witnesses?

LB4KHERH                          Pittas - Direct

1          THE COURT:  Yes.  Only the foreign witnesses need to

2     do a declaration, in conformity with 28 U.S.C. 1749, regarding

3     their testimony.  You're going to buy a copy of the transcript,

4     I assume?

5          MS. AGNIFILO:  Yes.

6          THE COURT:  And you can have them annex their

7     transcript and -- it's 1746.

8          MS. AGNIFILO:  Okay.

9          THE COURT:  So it's 28 U.S.C. 1746.

10          And we have our next witness.  You can call your next

11     witness, please.

12          MS. AGNIFILO:  Plaintiff calls to the stand Daniel

13     Sepulveda.

14          THE COURT:  All right.

15          Sir, could you please spell your last name.

16          THE WITNESS:  Yes.  S-e-p-u-l-v-e-d-a.

17          THE COURT:  And where are you physically located at

18     the moment?

19          THE WITNESS:  In California.

20          THE COURT:  All right.

21          I'm going to administer the oath to you.

22      DANIEL SEPULVEDA,

23          called as a witness by the Plaintiffs,

24          having been duly sworn, testified as follows:

25          THE COURT:  Thank you.

1           You may proceed.

2    DIRECT EXAMINATION

3    BY MS. AGNIFILO:

4    Q.  Mr. Sepulveda, can you please tell us a little bit about

5    yourself?  Where do you live, and what do you do?

6    A.  Yes.  I live in Malibu, California.  I am a freelance

7    stylist, just getting my career going.

8    Q.  Where were you living on or around early, like, January of

9    2017?

10   A.  I was living with my parents in Orange County.

11   Q.  California?

12   A.  Yes.

13   Q.  Did there come a time that you heard about something called

14   the Fyre Festival?

15   A.  Yes.

16   Q.  Do you remember when that was and how you heard about it?

17   A.  Dates specifically?  I don't.  I remember just seeing a

18   bunch of high-profile influencers I followed posting this

19   orange square, and it was just going all over the media.

20   That's when I first found out about it.

21   Q.  Did you at some point decide to purchase tickets to it?

22   A.  Yes.

23   Q.  What made you to decide to purchase tickets to it?

24   A.  The fact that it was a new festival being promoted at this

25   luxury, glamorous event that had never been done before, and

1    the fact that it was being offered at a discounted price since

2    it was the first year, which made it affordable.  So that's

3    what made me get it.

4    Q.  Do you remember when you purchased tickets, approximately?

5    A.  I have the receipt here.  I want to say it was the end of

6    2016.

7    Q.  Tell me, who were you planning on going with?

8    A.  Two of my good friends.

9    Q.  What are their names?

10   A.  Liliana Vergara and Valerie Marshall.

11   Q.  From the time that you purchased the tickets, do you

12   remember how much you paid for them?

13   A.  Yeah.  It was around two thousand -- I think it was 1945,

14   something around there.

15          THE COURT:  Stop for a second.  What was Ms. Vergara's

16   first name?

17          THE WITNESS:  Liliana.

18          THE COURT:  Okay.  Go ahead.

19   BY MS. AGNIFILO:

20   Q.  From the time that you purchased the tickets in late 2016

21   to the time that you were supposed to go to the festival, did

22   you receive communications from Fyre Festival/Fyre Media?

23   A.  Yes, actively.

24   Q.  What do you mean by "actively"?

25   A.  They constantly were sending updates.  I feel like as it

LB4KHERH                    Sepulveda - Direct

1     got closer to the date, they were constantly sending emails,

2     text messages, just kind of, like, preparing for us what the

3     weekend was going to look like, some things to look forward to.

4     Q.   Were you going the first weekend or the second weekend?

5     A.   The first.

6     Q.   So it was April 28th, 2017?

7     A.   Uh-huh, yes.

8     Q.   Can you take us through, from the time that you purchased

9     the tickets to the time that you went to the festival, what

10    expenses -- what quantifiable expenses you incurred leading up

11    to the festival regarding the festival?

12    A.   We had to purchase flights early on.  Obviously, we wanted

13    to look great, we thought it was going to be super glamorous

14    and fun, so we purchased a lot of clothing for it.  And then we

15    also ended up preloading money onto the wristbands, and it was

16    being promoted as cashless, and they opened up the window to

17    put money on your wristband a couple of days before the event.

18    Q.   Do you know the date?

19    A.   I don't know specifically, but I remember it certainly

20    being a couple of days right before my flight because I

21    thought, oh, great, I can preload, so when I get there, I'm

22    just like ready to go.

23    Q.   I'm going to ask you to take a look at a packet of material

24    that you provided to us that we have premarked as Exhibits D1

25    through 31.

1          Can you take a look at that?

2   A.   Sure.

3   Q.   Can you look at what's marked as D15, and tell me, does

4   that refresh your recollection regarding when you topped up or

5   put money on your Fyre wristband?

6   A.   Yes.  That was the email I got.

7   Q.   And so what's marked as Exhibit D15 for identification is

8   the email that you received right before the festival to put

9   money on your Fyre band; is that correct?

10  A.   Yes.

11          MS. AGNIFILO:  Your Honor, I would offer this

12  particular exhibit into evidence, numbered D15, just so that we

13  can discuss it right now.

14          THE COURT:  Received.  Go ahead.

15          (Plaintiffs' Exhibit D15 received in evidence)

16          MS. AGNIFILO:  Thank you.

17  BY MS. AGNIFILO:

18  Q.   Can you please tell us the date that's on there?

19  A.   Yes.  April 26, 2017.

20  Q.   That was two days before the festival; is that correct?

21  A.   Yes.

22  Q.   And you received this email, and as a result of this email,

23  did you put money on your Fyre band?

24  A.   Yes.  I remember I had just gotten my first income tax

25  check back from my job at the time, which was around $600, and

1      I completely put everything on there just because I really

2      wanted to have a great time.

3      Q.  When you received this email two days before, was it your

4      understanding that there would be a festival?

5      A.  Absolutely.

6      Q.  Did you rely upon that representation or that implied

7      representation from this email that there would be this

8      festival that made you put $600 on?

9      A.  Yes.

10     Q.  I would ask that you now take a look at what's been

11     premarked as Exhibits D1 through 31, and just could you --

12             THE COURT:  Let me ask, and maybe I can do this, D1,

13     2, and 3, and 4, do they accurately reflect expenditures that

14     you made in connection with the Fyre Festival?

15             THE WITNESS:  Yes.

16             THE COURT:  All right.

17             And D5, D6, D7, D8, D9, D10, D11, are these

18     communications you received from the promoters of the festival?

19             THE WITNESS:  Correct.

20             THE COURT:  Do you know the dates of any of the

21     documents, D5 through D11, the dates when you received them?

22             THE WITNESS:  D5 through 11?  I can't say I do.  I

23     have a lot of these screenshotted from the very beginning of

24     when this all took place.

25             THE COURT:  All right.

1        THE WITNESS:  It has been some time since then, so I'm

2  sorry, I can't recall.

3        THE COURT:  All right.

4        MS. AGNIFILO:  Your Honor, could I just point out that

5  D9 states April 17, D10 states April 18.

6        THE COURT:  Thank you very much.

7        MS. AGNIFILO:  And D11 says April 23rd.

8        THE COURT:  Thank you.

9        And would those have been on or about the dates you

10 received the communications?

11       THE WITNESS:  Yes.

12       THE COURT:  All right.

13       And D12, 13, 14, 15 are communications you received

14 from Fyre Festival on or about April 24, 2017; is that correct?

15       THE WITNESS:  Correct.

16       THE COURT:  All right.

17       And D16 is another communication that you received

18 from the Fyre Festival regarding your wristband; is that

19 correct?

20       THE WITNESS:  Correct.

21       THE COURT:  D17 is a communication you received from

22 the Fyre Festival on April 26, 2017, correct?

23       THE WITNESS:  Correct.

24       THE COURT:  And D18, such a communication received on

25 or about April 27, 2017, and that would be true for D18,

1   correct?

2               THE WITNESS:  Correct.

3               THE COURT:  Do you know when you received D19?

4               Would it help you that it says on there, "For those

5   with pending travel to Exuma tomorrow"?  Would that give you

6   any indication of when the document was sent to you?

7               THE WITNESS:  Right.  It would be on the April 27th,

8   then.

9               THE COURT:  All right.

10              Are D20, 21, 22 communications you received from the

11  Fyre Festival on or about April 28, 2017?

12              THE WITNESS:  Correct.

13              THE COURT:  All right.

14              D23, communication received from Fyre Festival on

15  April 30, 2017?

16              THE WITNESS:  Correct.

17              THE COURT:  And what is D24?

18              THE WITNESS:  That was the receipt that we got from

19  when me and my friend, Liliana, who bought both of our tickets,

20  that was the cost of it.

21              THE COURT:  All right.  Thank you.

22              And what is D25?

23              THE WITNESS:  That was just the screenshot I had of --

24  that was the link that was on Exhibit 23.  It was an attachment

25  they had, basically a huge summary of why the festival happened

LB4KHERH                         Sepulveda – Direct

1  the way it did, why everything went down the way it did, from

2  the night before of when it just went to chaos.

3              THE COURT:  All right.

4              And what are D26, 27, and 28 and 29?

5              THE WITNESS:  These were all stories that I had posted

6  on my Snapchat at the time.

7              THE COURT:  All right.

8              And they all bear the logo of the Fyre Festival?

9              THE WITNESS:  Yeah, they had a bunch of different GEO

10  tags at Exumas.

11              THE COURT:  All right.  What is D30?

12              THE WITNESS:  That was one of the little pictures I

13  took when we were actually on the island of how there were just

14  random people coming in and out of the campsite shuttling

15  guests around like that.

16              THE COURT:  And D31?

17              THE WITNESS:  That was the number of my tent that I

18  had.

19              THE COURT:  All right.  Thank you.

20              MS. AGNIFILO:  Can I just --

21              THE COURT:  And you're offering all of those, and

22  they're received on the same basis, which I indicated is

23  subject to further review by the Court.

24              MS. AGNIFILO:  Thank you.

25              (Plaintiffs' Exhibits D1 through D31 received in

1    evidence)

2              THE COURT:  Please proceed.  Go ahead.

3    BY MS. AGNIFILO:

4    Q.  Could you quickly tell us why you included D29 in your

5    packet?

6    A.  Oh, yes.  So the next day after when we got to the Bahamas,

7    we were on the beach all day long waiting to get our flight

8    back to Florida, and they promised us they were going to have a

9    mini convenience store on-site, so we could just, like, buy

10   everything — if we ran out of sunscreen, toilet paper, shampoo,

11   whatever it was — so we decided we'll buy the necessities at

12   the convenience store, and my poor little friend, who was very

13   pale skinned, was on the beach all day and thought that there

14   would be sunscreen, and she ended up getting pretty severe

15   burns from being on the beach all day with no protection.

16   Q.  It was represented to you that they would have those

17   amenities, and you relied on that; is that correct?

18   A.  Correct.

19             MS. AGNIFILO:  I have no further questions.

20             THE COURT:  Let's do a summary of what Mr. Sepulveda

21   lost.

22             You assert that you lost the $1,945, the tickets to

23   the festival, correct?

24             THE WITNESS:  Correct.

25             THE COURT:  And the $600 that you loaded on your

LB4KHERH                    Sepulveda – Direct

1    wristband sometime after April 26, 2017, about two days before

2    the festival, correct?

3                THE WITNESS:  Correct.

4                THE COURT:  And is there anything else you claim as

5    loss?

6                THE WITNESS:  Food, hotels, we had to pay for when we

7    got forced to be stuck in Miami, and then some Ubers, I had to

8    pay for.

9                THE COURT:  Do you have any receipts for any food or

10   any Uber?

11               THE WITNESS:  I'd have to look deep into my banking

12   information, but I definitely had them in there.

13               THE COURT:  How much was your food?

14               THE WITNESS:  I estimate around $300.

15               THE COURT:  And that would be food where?  Where did

16   you spend the $300?

17               THE WITNESS:  Just in general in Miami, in the

18   airport.  The food was supposed to be included in our ticket --

19               THE COURT:  No, I understand that part, but I'm asking

20   you where you spent money on food.  Was that before you went to

21   the festival or after you went to the festival?

22               THE WITNESS:  That was -- we were in Miami for two

23   days because we didn't want to pay for another earlier flight

24   that we had already booked, so we were forced to eat in Miami.

25               THE COURT:  So you were staying in Miami when you

1    thought you would have been staying on the island; is that

2    right?

3              THE WITNESS:  Correct.

4              THE COURT:  And the Uber, how much was that?

5              THE WITNESS:  I'd say around $200.

6              THE COURT:  What was that for?

7              THE WITNESS:  Just to get around and to go get food.

8    Just the bare minimum, airports.

9              THE COURT:  In Miami, when you returned from the

10   island?

11             THE WITNESS:  Uh-huh.

12             THE COURT:  Is that a yes?

13             THE WITNESS:  Yes.

14             THE COURT:  Okay.

15             Anything else?

16             THE WITNESS:  And the hotel, we had to pay for.

17             THE COURT:  How much was that?

18             THE WITNESS:  Six hundred.

19             THE COURT:  And that was in Miami?

20             THE WITNESS:  Yes.

21             THE COURT:  And did anyone else contribute to the cost

22   of that hotel?

23             THE WITNESS:  Yes.  It was the three of us.

24             THE COURT:  So your portion would have been 200?

25             THE WITNESS:  No.  I paid 600.

1          THE COURT:  And were you reimbursed from the other two

2     people?

3          THE WITNESS:  We all paid 600.  That was to cover the

4     hotel.

5          THE COURT:  The hotel was $1,800?

6          THE WITNESS:  Yes.

7          THE COURT:  And that was for how many nights?

8          THE WITNESS:  For two nights, I believe.

9          THE COURT:  And what hotel was that?

10          THE WITNESS:  I don't remember specifically.

11     Liliana's mother had booked it for us very last minute because

12     we were very tight on money, so she ended up booking it for us.

13          THE COURT:  All right.

14          Does that cover your expenses?

15          THE WITNESS:  Yes.

16          THE COURT:  Thank you very much.

17          MS. AGNIFILO:  I'm sorry, your Honor, I think we

18     missed Exhibit D1 and D3 of airfare, which I believe adds up to

19     256.29.

20          THE COURT:  All right.  And that was airfare from

21     where to where, sir?

22          THE WITNESS:  That was from Los Angeles to Florida.

23          THE COURT:  All right.  You got a good deal on those

24     tickets.

25          THE WITNESS:  I did, but it was very -- it was a

LB4KHERH

1    flight from hell.

2              THE COURT:  I understand, I understand.

3              Does that cover everything now?

4              THE WITNESS:  Yes.

5              THE COURT:  All right.

6              MS. AGNIFILO:  Thank you so much, your Honor.

7              And thank you so much, Mr. Sepulveda.

8              THE COURT:  All right.  Thank you.  You are excused.

9    Appreciate that.

10             THE WITNESS:  Thank you.  Thank you.  Bye-bye.

11             (Witness excused)

12             THE COURT:  Next witness.

13             MS. AGNIFILO:  Plaintiff calls to the stand

14   Mr. Herlihy, Matthew Herlihy, please.

15             THE COURT:  All right.

16             And this is going to be -- his exhibits are?

17             MS. AGNIFILO:  Herlihy is B.

18             THE COURT:  B.

19             THE DEPUTY CLERK:  B1 to?

20             MS. AGNIFILO:  B1 through B23.

21             This witness can join in three minutes, so if your

22   Honor would like --

23             THE COURT:  That's all right.

24             So you're offering Exhibit A1, the transcript, before

25   Judge Buchwald?

LB4KHERH

1          MS. AGNIFILO:  Correct.

2          THE COURT:  And F1, which is the superseding

3   information filed against Mr. McFarland.  They are received not

4   necessarily for the truth of their content, but the fact that

5   they were said; in the case of Mr. McFarland, statements under

6   oath at the hearing.  He is a party to this proceeding, and

7   they are admissions by a party.

8          And I will also receive Exhibit I on the same basis.

9          MS. AGNIFILO:  Thank you, your Honor.

10          (Plaintiffs' Exhibits A1, F1, and I received in

11   evidence)

12          THE COURT:  What is Exhibit H?  Where does that come

13   into play here?  Or are you withdrawing that?

14          MS. AGNIFILO:  One moment.

15          THE COURT:  This is a picture of bad food.  "Bad" is

16   in quotes.  It's not very appetizing, it doesn't -- it's just

17   not an appetizing.  And it looks like there's a picture of an

18   individual -- two pictures of an individual.

19          MS. AGNIFILO:  If you wouldn't mind, your Honor,

20   perhaps I might withdraw them, but I'd like an opportunity

21   to --

22          THE COURT:  Try it with this witness?

23          MS. AGNIFILO:  Correct.

24          THE COURT:  That's fine.  Good enough.

25          So we have an arrangement now on -- is 14 days going

LB4KHERH

1    to be convenient for you?

2              MS. AGNIFILO:  Yes, your Honor.  Thank you.

3              THE COURT:  Okay.

4              And it will be a letter brief, individual by

5    individual, you can have -- part of it will be an overall

6    summary, if you want, and then individual by individual, and a

7    proposed default judgment as to the recovery of each

8    individual.

9              And this, I take it, with the entry of that judgment,

10   it will terminate the case; is that correct?

11             MS. AGNIFILO:  Yes, your Honor.

12             THE COURT:  Okay.  Thank you.

13             MS. AGNIFILO:  We would ask that, as to the remaining

14   plaintiffs, that your Honor dismiss without prejudice their

15   cases.  So we were unable to locate them in time for today's

16   hearing, but in case they want to bring their claim in a small

17   claims action somewhere else in their jurisdiction, we would

18   just request that you would dismiss them without prejudice, and

19   then your Honor would be correct, that would be the end of this

20   matter.

21             THE COURT:  All right.  Well, you'll have to put that

22   in your letter application.  Ordinarily, when a case has

23   proceeded, as this one has, over this length of time, with

24   named parties, named plaintiffs, ordinarily dismissal without

25   prejudice would not be appropriate, but you can certainly ask

LB4KHERH

1   for it, and you can see whether you can provide some support

2   for it.

3             MS. AGNIFILO:  The witness just said he'll be on in

4   two minutes, your Honor.

5             THE COURT:  That's fine.

6             (Pause)

7             THE COURT:  You are Matthew Herlihy, spelt

8   H-e-r-l-i-l-y; is that correct?

9             THE WITNESS:  H-e-r-l-i-h-y.

10            THE COURT:  So what I have here has a misspelling, so

11  give it to me again from the beginning, H-e?

12            THE WITNESS:  H-e-r-l-i-h-y.

13            THE COURT:  One L or two Ls?

14            THE WITNESS:  One L.

15            THE COURT:  Thank you very much.

16            Where are you physically located at this time?

17            THE WITNESS:  I am in Chicago at the moment.

18            THE COURT:  All right.

19   MATTHEW HERLIHY,

20        called as a witness by the Plaintiffs,

21        having been duly sworn, testified as follows:

22            THE COURT:  You may inquire.

23            MS. AGNIFILO:  Thank you, your Honor.

24            (Continued on next page)

25

LB4KHERH                          Herlihy - Direct

1   DIRECT EXAMINATION

2   BY MS. AGNIFILO:

3   Q.  Can you please tell us a little bit about yourself?  What

4   do you do for a living, Mr. Herlihy?

5   A.  Sure.  I oversee the sales teams at a tech software

6   company.

7   Q.  Where do you live?

8   A.  I live in New York City.

9   Q.  But you're currently in Chicago on business, correct?

10  A.  Yes, correct.

11  Q.  Where were you -- in early 2017, where were you residing?

12  A.  I was in Astoria, Queens.

13  Q.  What were you doing then?

14  A.  I was a sales rep at a different software company.

15  Q.  Did there come a time in early 2017 or late 2016 that you

16  heard about something called the Fyre Festival?

17  A.  Yes, correct.

18  Q.  How did you hear about it?

19  A.  I had -- a friend had sent me a link to a social media

20  post, and I had come across it that way, and then had started

21  seeing a whole bunch of different social media posts about it.

22  Q.  Did you decide to purchase tickets to it?

23  A.  I did.

24  Q.  Do you know when that was?

25  A.  I believe it was November or December of that year.

LB4KHERH                         Herlihy - Direct

1   Q.  Of 2016, correct?

2   A.  Correct.

3   Q.  What was it about the Fyre Festival that made you want to

4   attend?

5   A.  So, one, you know, I think the allure of being in the

6   Bahamas with, you know, a bunch of -- it sounded like a fun

7   time with great people, some good musical acts, just the

8   overall experience.  It seemed they were promoting it as having

9   some really great chefs and things of that nature.  So the

10  overall, like, full experience between the entertainment, as

11  well as the food and beverage, as well as just being able to be

12  out there basically in the Bahamas.

13  Q.  Between the time that you purchased tickets and the time --

14  well, first of all, it was a two-weekend event, correct?

15  A.  It was -- so it was supposed to be two weekends, however, I

16  had purchased tickets for one of the two weekends.

17  Q.  Was it the first one or the second one?

18  A.  The first one.

19  Q.  So April 28, 2017?

20  A.  Yes.

21  Q.  Were you going with another person besides yourself?

22  A.  Yes, one friend.

23  Q.  What was that friend's name?

24  A.  Anthony Lauriello.

25  Q.  From the time that you purchased your tickets -- and we'll

1   go over the specific amounts and dollar amounts separately, but

2   from the time you purchased your tickets to the time that you

3   went to or were supposed to go to the Fyre Festival, did you

4   receive any communications from Fyre Media or from the Fyre

5   Festival organizers?

6   A.   Yes.  There was -- there was a whole lot of, like,

7   promotional emails that were sent, I think, to kind of keep up

8   the excitement.  There were emails in regards to, you know,

9   figuring out travel arrangements, and then, like, the week

10  before, there were emails about loading additional money onto a

11  band, a Fyre band, which they called it, to be able to pay for

12  things while we were down that.

13  Q.   So that was one week prior to April 28, 2017, that you were

14  receiving emails to put money on your Fyre band; is that

15  correct?

16  A.   Correct.

17  Q.   Did you, in fact, put money on your Fyre band after

18  receiving those emails?

19  A.   I did, yeah.

20  Q.   Do you know how much money you put on that?

21  A.   $900.

22  Q.   Was that -- at the time that you put $900 on your Fyre band

23  one week prior to going to the festival, was it your

24  understanding that the festival was still going to go on as

25  advertised?

1  A.  Yes, I was.  I mean, there was an email basically two days

2  prior that said they suggested putting on at least $300 per day

3  onto the Fyre band.

4  Q.  That was the day before the festival, on April 27th?

5  A.  It was two days before, Wednesday.

6  Q.  The 26th?

7  A.  Correct.

8  Q.  And was it important to you or material to you in your

9  decision to put $900 on the Fyre band that there would, in

10  fact, be a festival at all?

11  A.  Of course, yes.

12  Q.  Had you known what was actually going to transpire, you

13  would have not put $900 on there; is that correct?

14  A.  Yes, absolutely not.

15  Q.  Before I take you through Exhibits B1 through B23 and H1,

16  2, and 3, do you happen to have a tally of the amount of money

17  that you are out as a result of the Fyre Festival item by item?

18  A.  I do.  So, in terms of the tickets, it was $2,053.50.

19       THE COURT:  Well, let me ask you, Mr. Herlihy, that's

20  how much you paid for two tickets to the Fyre Festival,

21  correct?

22       THE WITNESS:  Correct.

23       THE COURT:  And you indicated it was for a second

24  individual, Anthony -- what was the last name?

25       THE WITNESS:  Lauriello.

1            THE COURT:  Lauriello?  Okay.

2            And did Mr. Lauriello reimburse you for his half of

3    the price of the tickets?

4            THE WITNESS:  Yes.  For half of that, yes.

5            THE COURT:  So you yourself were out one-half of the

6    2,053.50?

7            THE WITNESS:  Correct.

8            THE COURT:  But you were out the entirety of the 900?

9            THE WITNESS:  Yes, that's correct.

10           THE COURT:  What other items?

11           THE WITNESS:  Plane tickets to and from Miami.

12           THE COURT:  The plane tickets to and from Miami, is

13   that reflected on B6 and B7, Delta Airlines, in the amount of

14   $244?

15           THE WITNESS:  Correct.

16           THE COURT:  And 40 cents?  Okay.

17           And what else were you out?

18           THE WITNESS:  The only -- the other piece, and I was

19   not able to find -- I had used a different bank account at the

20   time -- was just hotel accommodations when the festival was

21   canceled.

22           THE COURT:  And these were in Miami?

23           THE WITNESS:  Yes, correct.

24           THE COURT:  All right.

25           And how much did you pay for a hotel in Miami?

1           THE WITNESS:  It was roughly $600 for the two nights.

2           THE COURT:  All right.

3           And did you pay that in the entirety, or was that

4   shared with your fellow travelers?

5           THE WITNESS:  I had paid that in the entirety, yes.

6           THE COURT:  All right.

7   BY MS. AGNIFILO:

8   Q.  So if my math is correct, it's $2,771.15; does that sound

9   correct to you, Mr. Herlihy?

10  A.  Yes.

11  Q.  Now I'd like you to please take a look at what's been

12  premarked as Exhibits B1 through B23.

13  A.  Uh-huh.

14  Q.  Is this a packet of material that you provided to our firm

15  regarding your experience, receipts, et cetera, from the Fyre

16  Festival?

17  A.  Yes, it is.

18  Q.  Could you just briefly take us through what these items

19  are?

20  A.  Sure.

21          So B1 and B2 are just confirmations in terms of the

22  ticket purchased.

23          B3, as well, that follows into there.

24          B4 is confirmations on the flights from Miami to the

25  Bahamas.

1          B6 through 8 are for the Delta Airlines flights from

2    New York to Miami and Miami back to New York.

3          THE COURT:  Let me ask, I just don't know these

4    things, but there is a reference to a refund amount on B8.

5    What does that relate to?

6          THE WITNESS:  That was the airline -- my ticket

7    purchase.

8          THE COURT:  All right.

9          Did you fly to Miami?  You did fly to Miami?

10         THE WITNESS:  Yes.

11         THE COURT:  What were they refunding, then?

12         I don't understand.  In other words, you bought a

13   ticket to fly to Miami, and you paid -- well, it was a

14   roundtrip ticket, leaving on Wednesday the 26th and returning

15   May 1.

16         THE WITNESS:  Uh-huh.

17         THE COURT:  And you were charged -- it looks like you

18   were charged $244.40 for that, and then you go to the next

19   page, and it seems to reflect a credit card refund.  I'm just

20   trying to piece this all together.

21         THE WITNESS:  Yeah, actually, I don't know, to be

22   honest, what that is.  I flew the weekend to Miami, so I didn't

23   get a refund.  I'm wondering if that is --

24         THE COURT:  Maybe an unrelated trip of some sort?

25         THE WITNESS:  It doesn't look it.  I'm wondering if

LB4KHERH                    Herlihy - Direct

1    it's just, like, if I needed a refund because -- like, I have

2    the statement on there, which I'm sure I was never refunded

3    anything --

4                 THE COURT:  Right.

5                 THE WITNESS:  -- but it looks like a different amount,

6    which I'm not understanding.

7                 THE COURT:  Okay.  Thank you.

8                 Go ahead.  Keep going.

9    BY MS. AGNIFILO:

10   Q.  You were on B11?

11                THE COURT:  Yes, so B11 was a communication on or

12   about April 26, 2017, from the Fyre Festival regarding the Fyre

13   band; is that correct, B11 and B12?

14                THE WITNESS:  That is correct.  This is them

15   suggesting to add money to be able to pay for activities and

16   drinks while we were down there.

17                THE COURT:  And in reliance on that, you put the money

18   on the Fyre band, correct?

19                THE WITNESS:  Correct.

20                THE COURT:  And B13 through B16 -- I'm sorry, through

21   B15 were communications you received on or about the day they

22   bear from the Fyre Festival; is that correct?

23                THE WITNESS:  Correct.

24                THE COURT:  All right.

25                What is B16?

1          THE WITNESS:  B16?  This is the charge for the Fyre

2     band, the last debit on there for $900 to fyrefestival.com.

3          THE COURT:  And what are B17 through B23?

4          THE WITNESS:  That is for the ticket purchased, the

5     monthly charge.

6          THE COURT:  Right.

7          THE WITNESS:  It was a table list for $410 per month.

8     BY MS. AGNIFILO:

9     Q.  So you were on like a payment plan, basically?

10    A.  Yeah, it was a monthly plan.  I believe it was on the 15th

11    of each month.

12         MS. AGNIFILO:  Your Honor, at this time, I would

13    request that these be received into evidence.

14         THE COURT:  All right.  B1 through B23 will be

15    received on the same basis as the other exhibits.

16         (Plaintiffs' Exhibit B1 through B23 received in

17    evidence)

18    BY MS. AGNIFILO:

19    Q.  Mr. Herlihy, would you mind taking a look at what's been

20    marked for identification as Exhibits H1, 2, and 3?

21    A.  Yes.  Give me one second.

22         Okay.

23    Q.  I'm going to now direct your attention to the actual

24    festival itself.

25         Did you go to the festival?

LB4KHERH                     Herlihy - Direct

1   A.  Yes, I did.

2   Q.  Can you just tell us what it was like?

3   A.  So, upon arriving at, I guess, the Bahamas airport, it was

4   already kind of a bit of a kind of all over the place.  So

5   there was supposed to be, like, luxury buses taking people to

6   the site, which was claimed to be like a private island.  We

7   ended up getting on the school buses and were taken to what

8   looked like a -- basically like a FEMA disaster relief center.

9   I mean, there were plastic tents set up, there were mattresses

10  that were all over the floor, there were lockers, which were

11  supposed to be for safekeeping of your belongings, which were

12  just laid horizontal on top of each other, stacked on top of

13  each other.  There was supposed to be giant tents, and upon

14  getting there, there was just a long line.  There was really no

15  order whatsoever.

16  Q.  Did you end up spending the night?

17  A.  That night, yes.

18  Q.  Did you find a tent?

19  A.  I did.

20          So after waiting for about 45 minutes or so, someone

21  had got on -- I don't -- I don't know if it was a pedestal or a

22  chair or something like that, and basically just said -- I

23  don't know if these were the exact words, but more or less,

24  every man for himself, go find a tent, and --

25  Q.  I'm going to ask you to take a look at what's been

1    premarked as Exhibit H2 and H3.

2                  Do you recognize those photos?

3    A.  Yes.  So that was exactly the time in which that

4    announcement was made.

5    Q.  Is that the individual who was standing on something and

6    making that announcement?

7    A.  Yes.

8    Q.  And do these photos in Exhibits H2 and 3 fairly and

9    accurately depict what it looked like at that time, when that

10   person made the announcement, sort of every man for himself?

11   A.  Yes, it does.

12                 MS. AGNIFILO:  At this time, I would ask these be

13   received into evidence.

14   Q.  Do you know who that individual is?

15   A.  Not at the time.  Now I do.

16   Q.  Who is that?

17   A.  Billy McFarland.

18   Q.  So he basically said every man for himself, go find a tent.

19                 And did you?

20   A.  We did.  Everyone basically ran in their own direction, and

21   we were able to -- my friend was able to find one that was

22   empty, thankfully, and I put my bag under the mattress.

23   Q.  I'm going to ask you to take a look at Exhibit H1.

24                 What is that?

25   A.  That was the food that was available for the night and the

1    next day.

2    Q.  Does that photograph fairly and accurately reflect the food

3    that was available at the festival?

4    A.  Yes.

5            MS. AGNIFILO:  I'd ask that that be received into

6    evidence as well.

7            THE COURT:  Received.

8            (Plaintiffs' Exhibit H1, H2, and H3 received in

9    evidence)

10           MS. AGNIFILO:  Thank you.

11   BY MS. AGNIFILO:

12   Q.  And, Mr. Herlihy, was the food that was depicted in there,

13   was that anything like the food that was advertised to you when

14   you bought tickets to this festival?

15   A.  No.  It was advertised as, like, Michelin star chefs,

16   five-star meals.  That was a big -- honestly, a big draw on

17   which I was interested in going.

18   Q.  So that was important to you?

19   A.  Yes.

20   Q.  Was that a material fact in your decision-making when you

21   purchased the tickets, that there would be Michelin star chef

22   food and something other than what's depicted in Exhibit H1?

23   A.  Yeah, it was a factor.

24   Q.  What were some of the other material factors that caused

25   you to purchase the tickets, what was important to you?

1  A.  The overall performances.  I think a weekend with

2  like-minded people on -- in the Bahamas on the beach.  I think

3  the ability to some of the different activities that they had

4  listed and offered were pretty exciting as well.

5  Q.  What were those activities?

6  A.  I mean, everything from jet skiing to swimming with pigs to

7  a treasure hunt on Pablo Escobar's island.

8  Q.  When you got there, was there jet skiing?

9  A.  No, there was none of the above or the --

10  Q.  So there was no treasure hunt?

11  A.  There was no treasure hunt.

12  Q.  Were you on Pablo Escobar's private island?

13  A.  We were not.

14  Q.  So all of the things that you relied upon, including that

15  there would be a music festival, which there was not, did not

16  occur; is that correct?

17  A.  That is correct.

18  Q.  Had you known all of that, you would not have purchased

19  tickets to this, correct?

20  A.  No, I would not have.

21       MS. AGNIFILO:  I have no further questions, your

22  Honor.

23       THE COURT:  All right.  Thank you very much,

24  Mr. Herlihy.  I appreciate your participation.  Thank you.

25  You're excused.

LB4KHERH

1              THE WITNESS:  Thank you.

2              (Witness excused)

3              THE COURT:  All right.

4              And does the plaintiff rest?

5              MS. AGNIFILO:  Yes, your Honor.

6              THE COURT:  All right.  Thank you, all, very much.  We

7      have a schedule for further proceedings.

8              We are adjourned.

9              (Adjourned)

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3     RITU JUTLA

 4    Direct By Ms. Agnifilo . . . . . . . . . . . . 6

 5     DANIEL JUNG

 6    Direct By Ms. Agnifilo . . . . . . . . . . . .37

 7     ZENOVIA PITTAS

 8    Direct By Ms. Agnifilo . . . . . . . . . . . .49

 9     DANIEL SEPULVEDA

10    Direct By Ms. Agnifilo . . . . . . . . . . . .66

11     MATTHEW HERLIHY

12    Direct By Ms. Agnifilo . . . . . . . . . . . .82

13                        PLAINTIFF EXHIBITS

14    Exhibit No.                               Received

15     G1 through 3   . . . . . . . . . . . . . . .47

16     D15    . . . . . . . . . . . . . . . . . . .69

17     D1 through D31 . . . . . . . . . . . . . . .73

18     A1, F1, and I  . . . . . . . . . . . . . . .79

19     B1 through B23   . . . . . . . . . . . . . .90

20     H1, H2, and H3   . . . . . . . . . . . . . .93

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300