UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
IN RE: FYRE FESTIVAL LITIGATION

                      17-cv-3296 (PKC)

                         ORDER

-----------------------------------------------------------x

CASTEL, U.S.D.J.

        On November 4, 2021, this Court conducted an evidentiary hearing, pursuant to Rule 55(b)(2), Fed. R. Civ. P., on the motions for a default judgment of the five remaining named plaintiffs who have elected to pursue a default judgment against defaulting defendant William McFarland arising out of the failed Fyre Festival.[1] The Festival was promoted as a luxurious event with premium accommodations, fine cuisine, amenities, and performing artists. It turned out that the facilities were grossly inadequate and a far cry from what had been promoted. Ultimately, the event was cancelled and none of the musical acts performed. The claims at issue on the default application are all fraud based. No contract claims against the sponsor of the festival, Fyre Media, Inc. is presented in this litigation. Five witnesses, all named plaintiffs, testified at the hearing: Rita Jutla, Daniel Jung, Zenovia Pittas, Daniel Sepulveda and Matthew Herlihy. Each testified credibly.

        On a default motion, the well-pleaded allegations of a complaint are accepted as admitted. Here, the complaint does not allege that McFarland planned and promoted the Fyre Festival as a fraudulent scheme from the festival's inception. Rather, the Fyre Festival was initially planned as a grand, luxury event, but it eventually became apparent that it would not live up to these plans. See e.g., SCAC ¶ 7 ("In the weeks before the Fyre Festival was to begin,

---

[1] Familiarity with the Courts several Opinions and Orders in this case is assumed and abbreviated terms are as defined in those prior Opinions and Orders.

Defendants . . . were aware that the Fyre Festival could not go forward."). From inception through failure, the festival was promoted by McFarland, Fyre Media, internet influencers and others through a series of evolving statements—some of which were knowingly false, some of which were puffery and some of which were either true, or true when made. But to succeed on a fraud claim, a plaintiff must have reasonably relied on a false statement and demonstrate that damages resulted from the statement.

If the case proceeded to trial, each plaintiff would need to prove that he or she heard or saw the fraudulent statement and relied on it in purchasing tickets or making travel plans, as distinguished from individuals who purchased tickets merely because friends or acquaintances had decided to attend. Because the SCAC alleges fraudulent statements made across several years of planning the festival, through different mediums such as Instagram, YouTube and the festival website, this inquiry is different for each plaintiff. Some statements, such as those contained in a "pitch deck," may have been seen by financial backers and promoters but not by many of the class members. (See SCAC ¶ 49.) Some of the statements are no more than non-actionable puffery, e.g. SCAC ¶ 67(i) ("Fyre is an experience and a festival"); ¶ 67(a) ("[t]he cultural experience of the decade"); ¶ 67(c)("you'll [ ] find yourself among some of the most incredible beaches and waters in the world"), or not plausibly alleged to be false, e.g. id. ¶ 67(l) ("[y]ou can plan an excursion with a local dive shop. . . ."); ¶ 67(k) ("[p]lan a stopover . . . to meet the pet sharks. . . .").

Plaintiffs now rely on the guilty plea allocution of McFarland to establish that the Festival was a fraud from its inception. But, read in context, McFarland's admission establishes that he engaged in fraudulent conduct in connection with a digital platform for concert promoters and private individuals to book performers for concerts. It was not a platform where the public

bought tickets for the Festival or any other event. With regard to the Festival, McFarland stated: "While my intention for the Fyre Festival was legitimate, I grossly underestimated the resources that it would take to execute an event of the magnitude that I had come up with." (Doc 161-1 (McFarland Mar. 6, 2018 Plea Tr.) at 12.) McFarland's statement does not support plaintiffs' newly adopted position that the Festival was fraudulent from its inception.

But the evidence at the hearing demonstrated that in the days immediately preceding the Festival, it was known by the Festival organizers, of which McFarland was the central player, that the luxurious event that had been promoted would not take place in the manner in which it had been promoted. Yet, Fyre Media, Inc., under McFarland's direction, sent emails in late April of 2017, in the days preceding the first weekend of the Festival, to ticket holders urging them to upload money—credits—on to a Festival wristband called a "Fyreband" for use in making purchases on the Festival grounds. In permitting these solicitations to be made by Fyre Media, Inc., McFarland knew that the representations had become false or fraudulent. Plaintiffs Jutla, Jung, Pittas and Sepulveda have proven that in the latter half of April 2017, they each uploaded a $600 for a credit to be placed on their Fyreband and plaintiff Herlihy has proven that he loaded $900 on to his Fyreband, none of which could be spent and none of which has been refunded. Each is entitled to recover these lost funds.

McFarland's decision to fraudulently double down on the promotion of the Festival in late April also supports certain plaintiffs' claims for emergency costs for lodging, travel and food incurred after travelling to the Festival. Had plaintiffs Jutla, Pittas, Sepulveda, and Herlihy been told the true and sorry state of affairs in late April, they would not have flown to the Exumas, where, in response to the unsafe conditions and the cancellation of the Festival, they had to secure emergency hotels, flights and food during the weekend. (See, e.g., Doc 168-1

(Nov. 4, 2021 Hearing Tr.) at 26-27 (Ms. Jutla's testimony that she was "somewhat skeptical" and had some "suspicion," noting that she wouldn't have travelled to the Festival had she known the April emails were fraudulent).)

        As for specific damages based on these emergency costs, Ms. Jutla spent $113.20 on an emergency flight from Miami to New York and $168.37 on an emergency hotel reservation (Doc 161-3 at 40-41, 36-37), totaling $281.57 in emergency costs.[2] In contrast, it is unclear how much Ms. Pittas spent on emergency flights and hotels. For Ms. Pittas's flight costs, plaintiffs' supplemental letter cites to an exhibit displaying the original flights—not the emergency flights—bought by Ms. Jutla and Ms. Pittas, and cites to the hearing transcript where Ms. Pittas discusses her round-trip flights from London to New York totaling £1,056.37 GBP, with no reference as to any emergency flight purchases. (Doc 168-1 at 62-63 ("THE COURT: And anything else? THE WITNESS: Not that I can find evidence of at the moment.")). Similarly, as to Ms. Pittas's hotel costs allegedly totaling $484.07, id. at 62, plaintiffs cite to exhibits displaying January 2017 hotel reservations and an April 2017 reservation for a two-person hotel room charged to, and claimed by Ms. Jutla in the supplemental letter. Ms. Pittas did not break down her hotel costs based on dates in her testimony. Finally, like Ms. Jutla, Ms. Pittas does not claim or cite emergency costs for food. Therefore, the Court lacks evidentiary support for awarding emergency costs to Ms. Pittas, which she may have incurred. As for Mr. Sepulveda, he testified to spending approximately $300 on food after returning early to Miami from the Festival, $200 on Uber rides for getting around Miami during the weekend, and $600 on hotel costs, totaling to approximately $1,100 in emergency costs.[3] Id. at 75-76. As for Mr.

---

[2] Based on the record, Ms. Jutla does not claim or cite emergency costs for food.
[3] The record does not indicate that Mr. Sepulveda paid for emergency flights. For his flight costs, plaintiffs cite to only Mr. Sepulveda's original flights from Los Angeles to Miami. (Doc 168 at 9.)

- 5 -

Herlihy, he testified to spending approximately $600 on hotel costs after returning early to Miami, which represents his total claimed emergency costs.[4]

The emergency costs captured above are also "losses suffered as a result of the fraudulent inducement" by McFarland and Fyre in late April, and the law entitles the relevant plaintiffs to damages.  <u>MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC</u>, 165 A.D.3d 108, 114 (1st Dep't 2018).

CONCLUSION

The Court will enter a Default Judgment consistent with this Order.

SO ORDERED.

<em>[signature]</em><br>
P. Kevin Castel<br>
United States District Judge

Dated: New York, New York
        December 15, 2021

---

[4] The record does not indicate that Mr. Herlihy paid for any emergency flights, nor does he claims emergency food costs.